HUDSON UNITED BANK *v.* CINNAMON RIDGE
CORPORATION ET AL.
(AC 23096)

Schaller, McLachlan and Peters, Js.

558

Argued May 27, 2003—officially released February 24, 2004

*Matthew B. Woods,* for the appellant-appellee (plaintiff).

*James A. Lenes,* for the appellees-appellants (defendants).

*Opinion*

SCHALLER, J. The plaintiff, Hudson United Bank (Hudson), appeals from the judgment of the trial court rendered on the jury's verdict in favor of the defendant

Cinnamon Ridge Corporation (Cinnamon)[1] on count one of the complaint that sought payment on a note and on Cinnamon's counterclaim that asserted that Hudson had breached the terms of a handwritten agreement and the covenant of good faith and fair dealing. Cinnamon cross appeals from the court's declaratory judgment in favor of Hudson on count two of the complaint regarding the ownership of a portfolio of second mortgage loans. On appeal, Hudson claims that (1) the court improperly failed to set aside the verdict in favor of Cinnamon on count one of the complaint, (2) there was insufficient evidence to support the verdict on counts one and two of the counterclaim, and (3) the court improperly determined that Hudson's breach of a handwritten agreement, coupled with its notification to certain subdivision homeowners that they were to pay their second mortgage loans to Hudson rather than to Cinnamon, excused Cinnamon's liability on the note. On cross appeal, Cinnamon claims that the court improperly concluded that Hudson was the owner of the portfolio of second mortgage loans. We affirm the judgment of the trial court.

The following facts and procedural history are necessary to the proper resolution of these appeals. In 1988, Ralph R. Arganese formed Cinnamon for the purpose of purchasing unimproved land and building a subdivision of approximately fifty-six residential home sites in Torrington. Lafayette American Bank and Trust Company (Lafayette)[2] loaned Cinnamon $3.5 million to purchase the property. Arganese personally guaranteed the

[1] Also named as defendants were Ralph R. Arganese and Tredd Mortgage Company, which Arganese owns. Tredd Mortgage Company is the assignee of a portfolio of second mortgage loans from Cinnamon that are at issue in these appeals. Although all the defendants have cross appealed, for convenience, we refer in this opinion to Cinnamon as the defendant.

[2] Hudson United Bank is the successor in interest to the original lender, Lafayette American Bank and Trust Company, which was the successor in interest to Lafayette American Bank.

loan. In 1992, Cinnamon borrowed an additional $600,000 from Lafayette to be used to construct the individual homes.[3] Arganese personally guaranteed that loan as well. In addition to the mortgages for buying the land and for building the homes, Lafayette and Cinnamon also entered into an agreement under which a prospective home buyer would be able to purchase a home, essentially, without providing a down payment. According to the agreement, Lafayette would provide the purchaser with 90 percent of the financing and, in return, would retain a first purchase money mortgage on the property. Cinnamon would then provide the purchaser with the remaining 10 percent of the financing and retain a second purchase money mortgage on the property.

In 1996, approximately forty-one lots of the subdivision had been improved and sold. Lafayette obtained first mortgages on all forty-one lots, and Cinnamon obtained second mortgages on those same lots.[4] Fifteen lots of the subdivision remained undeveloped and unsold. At that same time, however, the real estate market was in decline. In an effort to bring closure to the subdivision project, Arganese entered into discussions with Lafayette in an effort to restructure the loan in a manner that would allow Cinnamon to complete construction of the fifteen remaining lots while also meeting his obligation to repay the loans. Through their attorneys, Lafayette and Cinnamon worked out a loan restructuring plan under which Lafayette would loan Cinnamon an additional $400,000 while agreeing to a

---

[3] The $600,000 loan was a revolving loan under which Cinnamon could draw down money from the original $600,000 loan amount and use it to build houses. Then, when the house was sold, the $600,000 loan would be paid down with the proceeds from the sale. That would enable Cinnamon to draw back up against the $600,000 loan.

[4] Cinnamon assigned those mortgages to Tredd Mortgage Company, which is owned by Ralph Arganese.

friendly foreclosure[5] on the fifteen lots. In return, it was agreed that Cinnamon would receive the right of first refusal to purchase the foreclosed lots from Lafayette and an exclusive listing agreement.[6] Cinnamon also agreed to secure the note with its portfolio of second mortgages on the forty-one lots.

On June 28, 1996, the parties met to close the deal. Present at the meeting were Arthur E. Miller, the attorney for Lafayette; Robert E. Monaco, the vice president in Lafayette's lending office; Gregory J. Pepe, an attorney representing Cinnamon; Debra L. Arganese, who is Ralph Arganese's daughter and an attorney representing Cinnamon; Gene Arganese, who is Ralph Arganese's son; and Gloria P. Arganese, who is Ralph Arganese's wife. During the closing, representatives from Hudson and Cinnamon signed a handwritten agreement that had been drafted during the closing by Pepe and Miller. That handwritten agreement provided Cinnamon with an exclusive listing agreement to sell the foreclosed property and a right of first refusal to purchase the foreclosed property. The ultimate purpose of that handwritten agreement, as alleged in Cinnamon's special defenses, was to allow Cinnamon to "earn out" the moneys owed by Cinnamon under the note through real estate commissions or through profits realized through the resale of the foreclosed properties that Cinnamon chose to purchase from Hudson. The following day,

---

[5] In terms of that particular transaction, Gregory J. Pepe, Cinnamon's attorney, testified that the phrase "friendly foreclosure" meant that Cinnamon "was not going to contest the foreclosure of the [unsold subject] lots and properties by the bank. That is, it would be friendly . . . [and] would not contest it. It would go according to the filings by [Hudson which] . . . would take title accordingly."

[6] An exclusive listing agreement, or exclusive agency listing, is an agreement that provides that "the sale or lease of the property during the contract period, no matter by whom negotiated, obligates the property owner to pay a commission to the listing broker." *Colliers, Dow & Condon, Inc.* v. *Schwartz*, 77 Conn. App. 462, 473–74, 823 A.2d 438 (2003). Both Ralph Arganese and his son, Gene Arganese, were licensed real estate brokers.

Hudson acquired Lafayette, and Monaco was discharged from his corporate vice president position.

Cinnamon made interest payments on the $400,000 note and collected payments from the homeowners on the second mortgage loans for two years following the closing. In November, 1998, Hudson completed its friendly foreclosure on the fifteen lots. Hudson sold those lots between December, 1998, and March, 1999, to independent third parties without giving Cinnamon the exclusive listing rights or the right of first refusal. Consequently, Cinnamon stopped paying on the note. In July, 1999, Hudson directed deputy sheriffs in Torrington to hand deliver letters to the forty-one homeowners. In those letters, Hudson demanded that the homeowners pay Hudson the second mortgage loan installments.[7]

Hudson commenced an action, by way of a two count complaint alleging that (1) Cinnamon had defaulted on the $400,000 note and failed to make installment payments of interest (count one), and (2) requesting the court to render a declaratory judgment with respect to the ownership of the second mortgages (count two).[8] Cinnamon filed its special defenses and a counterclaim on March 13, 2002. The first special defense and the first count of the counterclaim alleged that Hudson had breached the terms of the handwritten agreement. The second special defense and the second count of the counterclaim alleged that Hudson had breached the covenant of good faith and fair dealing. The third special

---

[7] In those letters, Hudson indicated that Cinnamon was in default of its loan payments to Hudson and, as a result of a collateral assignment of mortgages, dated June 28, 1996, that Hudson owned the second mortgages encumbering the properties.

[8] In the second count of the complaint, Hudson alleged that Ralph Arganese and Tredd Mortgage Company, which he owns, may claim an interest in the second mortgages that were junior and subordinate to Hudson's interests in the property.

defense and the third count of the counterclaim alleged that Hudson had violated provisions of the Connecticut Unfair Trade Practices Act (CUTPA), General Statutes § 42-110a et seq.

Following a jury trial, the jury returned a unanimous verdict in favor of Cinnamon on the first count of the complaint. With respect to the second count of the complaint, the court had indicated at the beginning of the trial that it would decide the declaratory judgment issue after the jury returned a verdict on the first count. The court did not decide the declaratory judgment issue after the verdict. On the counterclaim, the jury awarded Cinnamon $190,000 in damages.

On March 19, 2002, Hudson filed a motion to set aside the verdict on the ground that there was insufficient evidence to warrant the jury's finding that Cinnamon was not liable to Hudson. The court denied the motion and, with respect to the second count of the complaint, declared that Hudson was the owner of the portfolio of second mortgages. Hudson appealed from the judgment rendered against it on the jury's verdict as to the first count of the complaint and the counterclaim, and Cinnamon cross appealed from the judgment rendered against it on the declaratory judgment count of the complaint.

## APPEAL

### I

Hudson first claims that the court improperly failed to set aside the verdict in favor of Cinnamon on count one of the complaint.[9] In support of that claim, Hudson

---

[9] As a threshold matter, Cinnamon argues that the court should not have considered the plaintiff's motion to set aside the verdict because the plaintiff failed to file a motion for a directed verdict previously. Practice Book § 16-37 provides in relevant part that "[a]fter the acceptance of a verdict and within the time stated in Section 16-35 for filing a motion to set a verdict aside, a party *who has moved* for a directed verdict may move to have the verdict and any judgment rendered thereon set aside and have judgment rendered in accordance with his or her motion for a directed verdict . . . ."

argues that although the jury found that it had breached the implied covenant of good faith and fair dealing, the jury did not find that Hudson had violated CUTPA and, therefore, no basis existed for the jury to fail to return a verdict in favor of the plaintiff on count one of the complaint.[10] In other words, the jury's finding that Hud-

(Emphasis added.) That is, to file a motion to set aside the verdict, the defendant argues, the plaintiff should have first filed a motion for a directed verdict. See *Salaman* v. *Waterbury*, 246 Conn. 298, 311, 717 A.2d 161 (1998) (*Katz, J.*, concurring) ("[i]t has long been the rule that '[a] motion for a directed verdict is a prerequisite to the filing of a motion to set aside the verdict' "); *Bauer* v. *Pounds*, 61 Conn. App. 29, 35, 762 A.2d 499 (2000). Our Supreme Court, however, has recognized that "a trial court has the inherent authority to set aside a verdict even where no motion to set aside the verdict has been filed." *Willow Springs Condominium Assn., Inc.* v. *Seventh BRT Development Corp.*, 245 Conn. 1, 49 n.44, 717 A.2d 77 (1998). It would, therefore, appear that the court had the inherent authority to set aside the verdict without the prior filing of a motion for a directed verdict.

The exercise of such authority is appropriate where a party *could not* raise an issue in a motion for a directed verdict during trial because the issue did not arise until after the jury returned its verdict. See id. The trial court may, for example, set aside the verdict in the exercise of its inherent power when that verdict is inconsistent, as a matter of law, with the jury's answers to interrogatories. See *Belchak* v. *New York, N. H. & H. R. Co.*, 119 Conn. 630, 635–37, 179 A. 95 (1935). In the present case, Hudson essentially claims that the verdict in favor of Cinnamon on count one of the complaint should have been set aside because the jury's answers to the interrogatories were inconsistent with its verdict. That is a claim that could not have been raised during the trial. Hence, it would appear that the court had the inherent authority to set aside the verdict without the prior filing of a motion for a directed verdict.

Typically, a defendant seeks a directed verdict. In this case, Hudson, the plaintiff, was the moving party and would have to have filed a motion for a directed verdict. "[A] directed verdict may be rendered only where, on the evidence viewed in the light most favorable to the nonmovant, [here, Cinnamon], the trier of fact could not reasonably reach any other conclusion than that embodied in the verdict as directed." (Internal quotation marks omitted.) *Miller* v. *United Technologies Corp.*, 233 Conn. 732, 752, 660 A.2d 810 (1995). In light of the special defenses, it would have been improper for Hudson to have sought a directed verdict in this case because the jury could have reasonably reached one of many different conclusions other than the one that might have been raised in a motion for a directed verdict.

[10] In support of its argument, Hudson relies on the fact that Ralph Arganese "unequivocally testified that $400,000 principal of the note was never repaid and that interest which accrued after 1999 was not paid," and that the jury

son had breached the covenant of good faith and fair dealing, alone, could not excuse Cinnamon's default on the $400,000 note.[11] We disagree.

The following additional facts are necessary to the proper resolution of Hudson's claim. In support of its verdict, the jury answered seven of the eight interrogatories that were submitted to it by the court.[12] The

did not make a finding of a CUTPA violation. That, Hudson argues, amounted to a judicial admission conclusive on the trier of fact. Hudson cites *LaSalle National Bank* v. *Freshfield Meadows, LLC*, 69 Conn. App. 824, 830, 798 A.2d 445 (2002), for that proposition of law. *LaSalle National Bank* is not, however, on point. In that case, we stated that although the trial court "did not expressly characterize [the] testimony as a judicial admission, it indicated that it regarded . . . [the] testimony as such by carefully distinguishing deposition testimony from the testimony given by [the witness] in the earlier proceeding." Id. In this case, the court made no such determination. "Whether a party's statement is a judicial admission or an evidentiary admission is a factual question for the trial court." (Internal quotation marks omitted.) *Harlan* v. *Norwalk Anesthesiology, P.C.*, 75 Conn. App. 600, 609, 816 A.2d 719, cert. denied, 264 Conn. 911, 826 A.2d 1155 (2003). Hudson provides no evidence that the court made such a finding, nor does it claim that it ever asked the court to make such a finding. Instead, Hudson simply presumes that because Ralph Arganese made the statement in court, it became a judicial admission automatically.

[11] Hudson's attorney's statements during appellate oral argument also help to define Hudson's specific claim. Counsel stated: "I'm not challenging the jury's verdict in the sense that it chose to believe one side as opposed to the other. I'm challenging the jury's verdict, basically, on the sufficiency of the evidence standard that once you take CUTPA out of the case, that there was no basis on which the jury could fail to find that [Cinnamon] was liable on the $400,000 note. CUTPA, from the beginning, was the trump card. In the event that the jury answered the interrogatory dealing with CUTPA in the affirmative, which it did not, then I think that the court might have been justified, based upon a finding of CUTPA violations, of finding no liability on the note. The court's discretionary powers under CUTPA are very broad."

[12] The interrogatories stated: "1. Is [Cinnamon] liable to the plaintiff bank on the note . . .

"2. If the answer to interrogatory number 1 is yes, what is the amount of damages the Bank is entitled to recover . . .

"3. Do you find that the handwritten letter dated June 28, 1996 is an enforceable contract entered into by the Bank . . .

"4. If the answer to interrogatory number 3 is yes, did the Bank breach the contract . . .

"5. If the answer to interrogatory number 3 is yes, did the Bank violate

jury's answers on the interrogatories indicated that (1) Cinnamon was not liable to Hudson on the $400,000 note, (2) the handwritten agreement, drafted during the June 28, 1996 closing, was an enforceable contract, (3) Hudson breached that contract, (4) as a result of that breach, Hudson violated the implied covenant of good faith and fair dealing, (5) Hudson did not violate CUTPA and (6) Cinnamon was entitled to $190,000 in damages.[13]

In its motion to set aside the verdict, Hudson argued that there was insufficient evidence to warrant the jury's finding that Cinnamon was not liable to Hudson on the note. In its memorandum of decision on that motion, the court stated that the jury was entitled to find that the commercial revolving loan agreement, the note, the

the covenant of good faith and fair dealing . . .

"6. If the answer to interrogatory number 3 is yes, did the Bank violate the Connecticut Unfair Trade Practices Act . . .

"7. If the answer to interrogatory number 3 is yes, and if the answer to any interrogatory 4, 5, or 6 is yes, what [are] the total damages sustained by [Cinnamon] . . .

"8. If the answer to interrogatories 1 and 3 is yes, please answer the following question: The Hudson United Bank shall recover $ ____ dollar damages from [Cinnamon] . . . ."

[13] Cinnamon argues that the general verdict rule should apply and require the court to presume that the jury found every issue in its favor. Specifically, Cinnamon argues that the interrogatories pertained to the counterclaim only and not to the special defenses to the complaint, and, therefore, Cinnamon concludes that the jury must have found against Hudson on the complaint and in favor of Cinnamon on the three special defenses.

"The so-called general verdict rule provides that, if a jury renders a general verdict for one party, and no party requests interrogatories, an appellate court will presume that the jury found every issue in favor of the prevailing party. . . . The rule applies whenever a verdict for one party could reasonably be rendered on one or more distinct causes of action . . . or distinct defenses." (Citations omitted; internal quotation marks omitted.) *Sandow* v. *Eckstein*, 67 Conn. App. 243, 248, 786 A.2d 1223 (2001), cert. denied, 259 Conn. 919, 791 A.2d 566 (2002). We disagree with Cinnamon's argument because interrogatories three and four pertained to the first special defense and the first count of the counterclaim. Interrogatories three and five concerned the second special defense and the second count of the counterclaim. Finally, interrogatories three and six concerned the third special defense and the third count of the counterclaim.

collateral security agreement and the handwritten agreement all were component parts of one larger agreement. The court stated that the jury was entitled to find that when Hudson *exercised* its rights under the collateral security agreement by requiring homeowners to pay it with respect to the second mortgage loans, Hudson acquired mortgages in *excess* of the value of the note. On the basis of that reasoning, the court concluded that the jury properly was entitled to find that Cinnamon was not liable to Hudson on the note.

"[T]he proper appellate standard of review when considering the action of a trial court granting or denying a motion to set aside a verdict and motion for a new trial . . . [is] the abuse of discretion standard. . . . In determining whether there has been an abuse of discretion, every reasonable presumption should be given in favor of the correctness of the court's ruling. . . . Reversal is required only where an abuse of discretion is manifest or where injustice appears to have been done. . . . We do not . . . determine whether a conclusion different from the one reached could have been reached. . . . A verdict must stand if it is one that a jury reasonably could have returned and the trial court has accepted." (Internal quotation marks omitted.) *Bolmer* v. *McKulsky*, 74 Conn. App. 499, 510, 812 A.2d 869, cert. denied, 262 Conn. 954, 818 A.2d 780 (2003).

We disagree with Hudson's reasoning. The interrogatories agreed on by the parties implied that a finding of a breach of the implied covenant of good faith and fair dealing may excuse nonperformance on the $400,000 note. Interrogatory seven stated: "If the answer to interrogatory number 3 is yes, and if the answer to any interrogatory 4, 5, *or* 6 is yes, what [are] the total damages sustained by [Cinnamon] . . . ?" (Emphasis added.) See footnote 12. The jury responded in the affirmative to interrogatories three, four and five. The jury responded in the negative with respect to inter-

rogatory six. Accordingly, the jury awarded $190,000 in response to interrogatory number seven.

It therefore is evident that the jury likely found damages on the breach of contract counterclaim totaling $190,000, but excused payment of the $400,000 note on the basis of its finding of the breach of the implied covenant of good faith and fair dealing. The very manner in which the parties drafted the interrogatories took into account that the jury could in fact award damages to Cinnamon on the counterclaim based on a finding either of the breach of the implied covenant of good faith and fair dealing *or* on a violation of CUTPA.

That is not the end of our inquiry. We must address, as suggested by Hudson's argument, whether the jury's finding that Hudson breached the implied covenant of good faith and fair dealing is legally inconsistent with its finding that Hudson did not commit a CUTPA violation.

"General Statutes § 42-110b (a) provides that [n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce. [I]n determining whether a practice violates CUTPA we have adopted the criteria set out in the cigarette rule by the federal trade commission for determining when a practice is unfair: (1) [W]hether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise—whether, in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes *substantial injury* to consumers [competitors or other businessmen] . . . . All three criteria do not need to be satisfied to support a finding of unfairness." (Emphasis added; internal quotation marks omitted.) *Calandro* v. *Allstate Ins. Co.*, 63 Conn. App.

602, 607–608, 778 A.2d 212 (2001). A violation of CUTPA, therefore, may be established by showing "either an actual deceptive practice . . . or a practice amounting to a violation of public policy." (Citation omitted.) *Web Press Services Corp.* v. *New London Motors, Inc.*, 203 Conn. 342, 355, 525 A.2d 57, following remand, 205 Conn. 479, 533 A.2d 1211 (1987).

"A practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three. . . . Moreover, [our Supreme Court] has set forth a three part test for satisfying the substantial injury criterion: [1] [the injury] must be substantial; [2] it must not be outweighed by any countervailing benefits to consumers or competition that the practice produces; and [3] it must be an injury that consumers themselves could not reasonably have avoided." (Internal quotation marks omitted.) *Calandro* v. *Allstate Ins. Co.*, supra, 63 Conn. App. 608.

Applying that criteria to the facts in this case, the jury reasonably could have concluded that Cinnamon failed to prove that Hudson's breach of the handwritten agreement resulted in a "substantial injury." At trial, Cinnamon admitted that negotiations concerning the workout agreement took place over many weeks. During that time, the parties discussed the right of first refusal and the exclusive listing agreement. Neither party provided evidence showing that those terms were codified in writing prior to the June 28, 1996 closing. The jury therefore reasonably could have concluded that Hudson's breach, on the basis of an allegation that the writing was not "formalized," was something that Cinnamon could have reasonably avoided.

Additionally, Cinnamon specifically alleged in its special defenses that Hudson's conduct was immoral, unethical, oppressive or unscrupulous. The jury could have reasonably concluded that Hudson's breach of

the handwritten agreement, which was drafted at the closing, did not rise to the level of a CUTPA violation. We have held that not every contractual breach rises to the level of a CUTPA violation. See *Paulus* v. *LaSala*, 56 Conn. App. 139, 153, 742 A.2d 379 (1999) ("[e]ven if, as the plaintiffs claim, the defendants breached a contract, such a breach is not sufficient to establish a CUTPA violation"), cert. denied, 252 Conn. 928, 746 A.2d 789 (2000); *Calandro* v. *Allstate Ins. Co.*, supra, 63 Conn. App. 617 (not every misrepresentation rises to level of CUTPA violation).

Because the jury reasonably could have concluded that Hudson breached the handwritten agreement, thereby violating the implied covenant of good faith and fair dealing, which was implicit within the overall agreement, without the breach rising to the level of a CUTPA violation, the court did not abuse its discretion when denying Hudson's motion to set aside the verdict on the basis of that claim.

## II

Hudson next claims that there was insufficient evidence to support the jury's verdict on the first two counts of the counterclaim, and, therefore, that the court improperly denied the motion to set aside the verdict. We disagree.

"We are disinclined to disturb jury verdicts, and we accord great deference to the vantage of the trial judge, who possesses a unique opportunity to evaluate the credibility of witnesses. . . . The concurrence of the judgments of the [trial] judge and the jury . . . is a powerful argument for upholding the verdict. . . . Furthermore, it is not the function of this court to sit as the seventh juror when we review the sufficiency of the evidence . . . rather, we must determine, in the light most favorable to sustaining the verdict, whether the totality of the evidence, including reasonable infer-

ences therefrom, supports the jury's verdict. . . . In making this determination, [t]he evidence must be given the most favorable construction in support of the verdict of which it is reasonably capable. . . . In other words, [i]f the jury could reasonably have reached its conclusion, the verdict must stand, even if this court disagrees with it." (Internal quotation marks omitted.) *Meek* v. *Wal-Mart Stores, Inc.*, 72 Conn. App. 467, 472–73, 806 A.2d 546, cert. denied, 262 Conn. 912, 810 A.2d 278 (2002).

## A

Hudson first argues that there was insufficient evidence to support the verdict on the first count of Cinnamon's counterclaim. We disagree.

The first count of the counterclaim alleged that Hudson had breached the terms of the handwritten agreement. For the jury to have concluded reasonably that Hudson breached the terms of the handwritten agreement, the jury must have concluded that Hudson was bound to the agreement. In support of its claim, Hudson argues that Monaco did not have authority to execute the handwritten agreement.

"The existence of a contract is a question of fact to be determined by the trier on the basis of all the evidence." (Internal quotation marks omitted.) *John M. Glover Agency* v. *RDB Building, LLC*, 60 Conn. App. 640, 643, 760 A.2d 980 (2000). In this case, the parties are not in dispute as to the terms of the contract, but instead question whether a contract existed on the basis of whether Monaco could legally bind Hudson to the terms of the handwritten agreement.

It is well settled that a corporation can act only through its agents. See *Lieberman* v. *Reliable Refuse Co.*, 212 Conn. 661, 673, 563 A.2d 1013 (1989). Furthermore, "it is a general rule of agency law that the princi-

ple in an agency relationship is bound by, and liable for, the acts in which his agent engages with authority from the principal, and within the scope of the agent's employment. . . . An agent's authority may be actual or apparent. . . . Actual authority exists when [an agent's] action [is] expressly authorized by resolution of the board of directors . . . [is] impliedly authorized by the board of directors . . . or . . . although not authorized, [is] subsequently ratified by the board of directors. . . . Apparent authority is that semblance of authority that a principal, through its own acts or inadvertences, causes or allows third persons to believe the principal's agent possesses." (Citations omitted; internal quotation marks omitted.) *Maharishi School of Vedic Sciences, Inc. (Connecticut)* v. *Connecticut Constitution Associates Ltd. Partnership*, 260 Conn. 598, 606–607, 799 A.2d 1027 (2002).

"[A]pparent authority is to be determined, not by the agent's own acts, but by the acts of the agent's principal. . . . The issue of apparent authority is one of fact to be determined based on two criteria. . . . First, it must appear from the principal's conduct that the principal held the agent out as possessing sufficient authority to embrace the act in question, or knowingly permitted [the agent] to act as having such authority. . . . Second, the party dealing with the agent must have, acting in good faith, reasonably believed, under all the circumstances, that the agent had the necessary authority to bind the principal to the agent's action." (Internal quotation marks omitted.) *Gordon* v. *Tobias*, 262 Conn. 844, 850–51, 817 A.2d 683 (2003).

In this case, Lafayette's representative at the closing was Monaco, a corporate vice president. Generally, a corporate vice president does not have the inherent authority to bind the corporation to notes or to contracts. 1 J. Cox, T. Hazen & F. O'Neal, Corporations (1995) § 8.8, p. 8.22. "A vice president, however, is some-

times entrusted with management of the business or a particular part of it, and in such a case he or she may bind the corporation by a contract within the scope of express or *apparent* authority." (Emphasis added.) Id.

The facts presented at trial reasonably could support the jury's finding that Monaco had either implied actual authority or apparent authority to bind the corporation to the terms of the handwritten agreement. Although at no time did Monaco or Miller expressly state that Monaco had the authority to bind the bank to the handwritten agreement, their actions, in addition to Hudson's actions, reasonably could have led Cinnamon to believe that Monaco had such authority.

The events leading to the closing shed light on the parties' beliefs at the time that the handwritten agreement was signed. Both Ralph Arganese and Cinnamon had a long-standing business relationship with Lafayette. Hudson was planning to acquire Lafayette one day following the closing, on or about June 29, 1996, and premised that acquisition on the handling of the Cinnamon loans. Lafayette's representatives during the closing, Miller and Monaco, indicated that the parties had to finish the workout agreement that same day. Consequently, the closing began at 2 p.m. and ended sometime later that night. Pepe testified that Monaco and Miller had negotiated the terms of the workout agreement with him for "months and months." Pepe and Miller had agreed to resolve some of the outstanding issues with Monaco during the closing. Pepe had prior experience with workout officers from Lafayette, and his prior course of dealings with them indicated that they had a significant amount of discretion to make deals. Despite the importance of the closing, Lafayette sent Monaco to represent the bank at the closing.

Debra Arganese testified that at some time during the closing, she overheard Miller or Monaco announce

that they had to leave the room to obtain authorization for Monaco to sign the handwritten agreement. She also testified that she saw Monaco in another room on a telephone talking to "someone" after he made that announcement, and that he then returned to the room and stated that everything would be signed and that everything would work.

Gene Arganese testified that Monaco had told him during the closing that he would leave the room to have the handwritten agreement "blessed" and that he would return. Upon returning to the room, Monaco stated that they were "all set." Miller then responded that he wanted to add a paragraph to the end of the third page in the handwritten agreement. Miller testified that Monaco had authority on behalf of Lafayette to sign the hand-written agreement. At no time following those tele-phone conversations with the bank did the bank inform Monaco to terminate the closing.

Pepe, Ralph Arganese and Debra Arganese testified that at no time after Monaco signed the handwritten agreement did Monaco state that he needed additional authority from the bank to bind the bank to the hand-written agreement. Additionally, they testified that Monaco never told them that the handwritten agreement was subject to further bank approval. Hud-son argues that language in the handwritten agreement indicating that the writing required further "formaliza-tion" was evidence that Monaco and Pepe had agreed that Monaco did not have authority or that additional bank approval was required. Pepe testified, however, that "formalization" referred to having the handwritten document later typed so that it would take on a more "formal" appearance. Hudson also argues that Cinna-mon must have been on notice that Monaco did not have authority to bind the bank because Ralph Arganese had provided certificates of authorization enabling him to bind Cinnamon during the workout and that Monaco

did not provide such a certificate. Pepe testified that in his twenty years of involvement with numerous workout agreements, he had never seen such a certificate before.

On the basis of that evidence, the jury reasonably could have concluded that Lafayette had a vested interest in wanting to complete the closing on June 28, 1996, had knowledge of the value of the transactions involved and had sent Monaco to represent its interests, with Miller, at the closing. In light of that situation, the jury reasonably could have concluded that Cinnamon and Ralph Arganese had had a good faith and reasonable belief that Monaco had either implied actual or apparent authority to bind Lafayette to the handwritten agreement.

B

Having determined that the jury reasonably could have concluded that Monaco had authority to execute the agreement, thereby binding Hudson, we can proceed to address Hudson's argument that there was insufficient evidence to conclude that Hudson breached the implied covenant of good faith and fair dealing, as alleged in the second count of the counterclaim.

"Every contract carries an implied covenant of good faith and fair dealing requiring that neither party do anything that will injure the right of the other to receive the benefits of the agreement." (Internal quotation marks omitted.) *Gaudio* v. *Griffin Health Services Corp.*, 249 Conn. 523, 564, 733 A.2d 197 (1999) (*Callahan, C. J.*, dissenting). "Bad faith means more than mere negligence; it involves a dishonest purpose. . . . Bad faith in general implies both actual or constructive fraud, or a design to mislead or deceive another, or a neglect or refusal to fulfill some duty or some contractual obligation, not prompted by an honest mistake as to one's rights or duties, but by some interested or

sinister motive." (Citation omitted; internal quotation marks omitted.) *Cadle Co.* v. *Ginsberg*, 70 Conn. App. 748, 768, 802 A.2d 137, cert. denied, 262 Conn. 905, 810 A.2d 271 (2002).

The jury heard testimony indicating that the handwritten agreement was a component integral to the completion of the overall workout loan restructuring. Cinnamon considered the handwritten agreement instrumental to the loan and the ultimate workout agreement because the handwritten agreement offered Cinnamon two methods to earn money that could ultimately be used to pay off the principal balance of the $400,000 note. The exclusive listing rights offered Cinnamon the chance to earn commissions. The right of first refusal offered Cinnamon the opportunity to purchase the foreclosed lots at a greatly reduced rate and then, later, resell them at a higher current market rate. Pepe and Gene Arganese testified that if Monaco had not agreed to sign the handwritten agreement, then Ralph Arganese would not have signed the $400,000 note or agreed to the friendly foreclosure with the collateral assignment of the portfolio of second mortgage loans.

Accordingly, if the jury determined that Hudson was bound to the terms in the handwritten agreement by Monaco under a theory of either implied actual authority or apparent authority and subsequently breached that agreement, it stands to reason that on the basis of that evidence, the jury reasonably could have concluded that Hudson had breached the implied covenant of good faith and fair dealing. The court did not therefore improperly decline to set aside the verdict on that claim.

## III

Hudson's final claim is that the court improperly determined that Hudson's breach of the handwritten agreement, coupled with its notification to the subdivi-

sion homeowners that they were to pay their second mortgage loans to it rather than to Cinnamon, excused Cinnamon's liability on the note. Specifically, Hudson argues that (1) paragraph twelve of the commercial revolving loan and security agreement provided Hudson license to seize the portfolio of second mortgage loans and also to recover the outstanding balance on the $400,000 note, and (2) because Cinnamon promised to pay $400,000, and not the "equivalency" of $400,000 in second mortgages, the court improperly permitted the second mortgages to satisfy the $400,000 debt. We are not persuaded.

The following additional facts are necessary to the proper resolution of Hudson's claim. On December 29, 1998, Hudson sold four of the fifteen foreclosed lots to MTGLQ Investors for $69,487. Joseph Anania, Cinnamon's certified real estate appraiser, testified at trial that he had appraised those same lots between December 12, 1998, and March 25, 1999, and valued four of the fifteen "vacant buildable sites" at $116,000. The remaining eleven lots were sold to a country club in Torrington on March 25, 1999, for $165,000. Anania valued those eleven lots at $319,500. Therefore, Hudson sold the fifteen foreclosed lots for $234,487. By comparison, Anania valued those same lots at $435,500.

In January, 1999, after learning about the sales, Cinnamon stopped making payments on the note. In July, 1999, Hudson directed deputy sheriffs in Torrington to deliver letters to the homeowners who had given second mortgages to Cinnamon and requested that the homeowners begin making payments to Hudson directly. After making the demand, Hudson collected only $9200 over the course of two years on the portfolio of second mortgage loans. By comparison, Cinnamon had collected approximately $22,500 during the last six months that it controlled the portfolio of second mortgage loans. At trial, Cinnamon's accountant, Daniel Fusco,

discussed the write off detail report concerning the value of the second mortgage portfolio. During that testimony, he indicated that the portfolio was valued at $488,136.44 as of October 15, 1999.

Following the trial, on April 24, 2002, Cinnamon amended its answer to Hudson's complaint by adding a fourth special defense to conform to the proof that was offered at trial. The fourth special defense alleged that because Hudson had breached the terms of the handwritten agreement and controlled the portfolio of second mortgage loans, and because the value of the portfolio of loans exceeded $400,000, Hudson had "received all to which it was entitled and [Cinnamon] was not obligated to repay the note."

## A

Hudson first argues that paragraph twelve[14] of the commercial revolving loan and security agreement provided Hudson license to seize the portfolio of second

---

[14] Paragraph twelve of the commercial revolving loan and security agreement states in relevant part: "Upon or at any time after default in payment of the Obligations or in the performance of any obligation, representation, covenant or agreement herein or in the Note or other instruments given by Borrower relating to or securing the Obligations, Lender may, at its option, without notice and without regard to the adequacy of the security for the Obligations, in person or by agent, with or without bringing any action, suit or proceeding (i) refuse to extend and further advances hereunder, and/or (ii) collect and receive all sums due under the Second Loan Documents, including the past due, with full power to undertake from time to time all actions as it may deem proper and enforce, modify and compromise the collection of such sums, and do all things required of or permitted to Borrower under the Second Loan Documents and do any acts which Lender deems proper to protect the security hereof until all indebtedness secured hereby is paid in full, and in its own name sue or otherwise collect and receive all sums due under the Second Loan Documents, including the past due, and apply the same, less costs and expenses of collection, including court costs and reasonable attorneys' fees, to the Obligations. Lender shall not be accountable for more money than it actually receives, nor shall it be liable for failure to collect any sums for any reason whatsoever. Borrower shall facilitate in all reasonable ways any action taken by Lender under this paragraph. . . ."

mortgage loans and *also* to recover the outstanding balance on the $400,000 note on Cinnamon's default. Cinnamon argues that such an interpretation would impermissibly allow Hudson to recover twice on the note.

Hudson specifically relies on the following language in paragraph twelve of the commercial revolving loan and security agreement to support its interpretation of the contract: "Upon or at any time after default in the payment of the Obligations[15] . . . Lender may, at its option . . . without regard to the adequacy of the security for the Obligations . . . collect and receive all sums due under the Second Loan Documents[16] . . . until all indebtedness secured hereby is paid in full . . . . Lender shall not be accountable for more money than it actually receives, nor shall it be liable for failure to collect any sums for any reason whatsoever. . . ."

"Although ordinarily the question of contract interpretation, being a question of the parties' intent, is a question of fact . . . [w]here there is definitive contract language, the determination of what the parties intended by their contractual commitments is a question of law. . . . When . . . the trial court draws conclusions of law, our review is plenary and we must decide whether its conclusions are legally and logically correct . . . .

"[T]he interpretation and construction of a written contract present only questions of law, within the province of the court . . . so long as the contract is unambiguous and the intent of the parties can be determined from the agreement's face . . . . A court will not tor-

---

[15] The term "obligations" is defined in paragraph 1 (f) in the commercial revolving loan and security agreement as meaning the commercial revolving loan.

[16] The term "second loan documents" is defined in paragraph 1 (j) in the commercial revolving loan and security agreement as the second mortgages and second notes.

ture words to import ambiguity where the ordinary meaning leaves no room for ambiguity, and words do not become ambiguous simply because lawyers or laymen contend for different meanings. . . . When the plain meaning and intent of the language is clear, a clause . . . cannot be enlarged by construction. There is no room for construction where the terms of a writing are clear and unambiguous, and it is to be given effect according to its language." (Citations omitted; internal quotation marks omitted.) *Gager* v. *Gager & Peterson, LLP,* 76 Conn. App. 552, 556–57, 820 A.2d 1063 (2003).

The provision in question, paragraph twelve of the commercial revolving loan and security agreement, is too vague and ambiguous to be read in the manner offered by Hudson and to provide Hudson with the authorization to seize the portfolio *in addition to* recovering the unpaid balance of the note. The provision does not specify to whom the lender "shall not be accountable for more money than it actually receives . . . ." Primarily, the provision is silent as to Hudson's authority with respect to the second mortgage loans when the default follows Hudson's breach of the handwritten agreement, which, as previously stated, the jury and the court concluded comprised one agreement along with the note, the loan agreement and the collateral assignment of the mortgage loans. The provision does not indicate the type of liability from which the lender would be shielded. It also does not expressly state that Hudson may sue on the note while collecting on the second mortgage loans. Accordingly, that matter of contract interpretation involved a question of fact for the court. We will therefore review the claim under the clearly erroneous standard of review.

"A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite

and firm conviction that a mistake has been committed. . . . It is axiomatic that we defer to the trial court's assessment of the credibility of witnesses and the weight to afford their testimony." (Citations omitted; internal quotation marks omitted.) *Montville* v. *Antonino*, 77 Conn. App. 862, 869–70, 825 A.2d 230 (2003).

The undisputed value of the note was $400,000. The appraised value of the land was $435,500. Hudson's breach of the handwritten agreement prevented Cinnamon from obtaining the $35,500 profit on the resale of the homes that would have resulted from the right of first refusal. The assessed value of the portfolio of second mortgage loans exceeded the note value by $88,136.44. Cinnamon lost the sales commissions associated with the sale of the fifteen lots. In the end, the jury decided in favor of Cinnamon for $190,000 in damages. On the basis of that evidence, it was not clearly erroneous for the court to have concluded that the parties intended to permit recovery on the note via the portfolio of second mortgage loans alone.

### B

Hudson argues that because Cinnamon promised to pay $400,000, and not the "equivalency" of $400,000, in second mortgage loans, the court improperly permitted the second mortgages to satisfy the $400,000 debt. That amounts to a challenge concerning the "medium" of the payment.

Again, "[t]he interpretation and construction of a written contract present only questions of law, within the province of the court . . . so long as the contract is unambiguous and the intent of the parties can be determined from the agreement's face . . . ." *Gager* v. *Gager & Peterson, LLP*, supra, 76 Conn. App. 556–57. The commercial revolving note provided that Cinnamon promised to pay Lafayette the sum of $400,000. The language was not ambiguous, and Cinnamon clearly

promised to pay Lafayette in "money." Our standard of review, then, is plenary.

"The word 'tender' is generally defined as an unconditional offer of payment consisting in the actual production of a sum not less than the amount due on a specific debt or obligation. The only distinction between a tender and payment lies in the fact that a tender is not accepted, while a payment is. While tender does not discharge or satisfy a debt, payment does. Likewise, a refusal to accept money tendered does not operate as a discharge of a debt." 60 Am. Jur. 2d, Payment § 4 (2003). The general rule concerning the requirement that payments be made in money provides "that both the payment of and tender of payment of a debt must be in money, unless the parties agree otherwise, or the obligee consents to accept some other medium of payment. If an obligation calls for a money discharge, then there cannot be payment except by paying the full amount called for in money, or the representative of money. Unless the parties so agree, a debtor has no right, except at his or her own peril, to substitute something in lieu of money as the medium of payment of a debt. . . ." Id., § 21; see also *State* v. *Lex Associates*, 248 Conn. 612, 629, 730 A.2d 38 (1999) ("[A] tender of payment is not the equivalent of payment itself. Refusal of a tender of payment, however, while it does not discharge a debt, discharges any further accrual of interest if the purchaser keeps the tender . . . .").

Hudson relies on the holding of *Bank Boston Connecticut* v. *Platz*, 41 Conn. Sup. 587, 596 A.2d 31 (1991), to argue that both tender and payment of the $400,000 had to be in money and not by application of the value of the portfolio of second mortgages to the debt. In *Bank Boston Connecticut*, the plaintiff bank foreclosed the defendants' mortgage. The defendants raised a special defense alleging that because they had tendered to the plaintiff a quitclaim deed to the subject property,

the deed served to discharge them from their debt. The trial court struck that special defense, concluding that although a foreclosure judgment may vest title in a plaintiff and a deficiency judgment may be calculated by offsetting the value of the property against the debt, those consequences do not constitute a plaintiff's consent to accept the property as the medium for payment of the debt.

It is apparent from the facts that Hudson consented to accept payment on the note in a medium other than cash. The commercial revolving note provided that Cinnamon promised to pay Lafayette the sum of $400,000. Although the note indicated a promise to pay Lafayette in "money," this case is distinguishable from *Bank Boston Connecticut* because Hudson *accepted* the non-money payment. By agreeing to the terms of the commercial revolving note and accepting the collateral assignment of the portfolio of second mortgage loans as security for the debt, Hudson cannot now argue that it did not consent to accept payment in a medium other than money. Additionally, in *Bank Boston Connecticut*, the defendants tendered the payment, and the bank refused to accept that medium of payment. Here, Hudson itself, unilaterally, acted on the collateral and accepted it as payment.

We therefore conclude that Hudson's acceptance of the second mortgage loans satisfied Cinnamon's payment obligation under the note despite the medium of payment.

CROSS APPEAL

IV

On cross appeal, Cinnamon claims that the court improperly concluded that Hudson was the owner of the second mortgage loans. We conclude that the record is inadequate for our review.

The following additional facts are necessary to the proper resolution of Cinnamon's claim. With respect to the second count of the complaint, at the beginning of the trial, the court indicated that it would decide the declaratory judgment issue after the jury returned a verdict on the first count. Accordingly, following the jury trial, in its memorandum of decision concerning the motion to set aside the verdict, the court declared that Hudson was the owner of the portfolio of second mortgages. In its memorandum of decision, the court stated: "The second count of the complaint also seeks a declaratory judgment as to the ownership of the second mortgages. At the beginning of the trial, the court stated it would decide that question after the verdict was rendered. In accordance with the relief requested by [Hudson], the court hereby declares that [Hudson] is the owner of the second mortgages."

"It is incumbent upon the appellant to take the necessary steps to sustain its burden of providing an adequate record for appellate review. . . . [A]n appellate tribunal cannot render a decision without first fully understanding the disposition being appealed. . . . Our role is not to guess at possibilities, but to review claims based on a complete factual record developed by a trial court. . . . Without the necessary factual and legal conclusions furnished by the trial court . . . any decision made by us respecting [the defendant's claims] would be entirely speculative." (Citations omitted; internal quotation marks omitted.) *Gladstone, Schwartz, Baroff* v. *Hovhannissian*, 53 Conn. App. 122, 127, 728 A.2d 1140 (1999). The parties dispute the underlying facts as to how both the jury and the court arrived at the conclusion that Hudson could retain the mortgages. Compare *Ammirata* v. *Zoning Board of Appeals*, 264 Conn. 737, 745–46, 826 A.2d 170 (2003) (where pertinent facts, procedural history not in dispute, record adequate for review).

Cinnamon failed to file a motion for an articulation of the court's decision, and we are left with a decision that does not provide us any insight into its reasoning. Accordingly, we decline to review the claim.

The judgment is affirmed.

In this opinion the other judges concurred.