CONNECTICUT LIGHT AND POWER COMPANY *v.*
WESTVIEW CARLTON GROUP, LLC, ET AL.
(AC 28470)

Bishop, Gruendel and Borden, Js.

Argued March 20—officially released June 24, 2008

*Dov Braunstein*, with whom was *Lawrence S. Dressler*, for the appellants-appellees (defendants).

*Jeanine M. Dumont*, for the appellee-appellant (plaintiff).

*Opinion*

BORDEN, J. The defendants, Westview Carlton Group, LLC (Westview), and Howard S. Sousa, Westview's sole shareholder, appeal from the judgment of the trial court, finding them both liable for electrical services supplied by the plaintiff, Connecticut Light & Power Company, to two buildings owned by Westview. The defendants claim that the court improperly (1) pierced the corporate veil as to Sousa, (2) concluded that the plaintiff was not required to mitigate its damages by applying for a receiver of rents and (3) awarded prejudgment interest to the plaintiff. The plaintiff cross appeals from the judgment, claiming that the court improperly rejected its claim that was based on the Connecticut Unfair Trade Practices Act (CUTPA), General Statutes § 42-110a et seq. We affirm the judgment of the trial court in all respects.

The plaintiff brought this action in three counts. In the first count, the plaintiff claimed a written contract

with Westview and, as to Sousa, that he was personally liable to the plaintiff on a theory of piercing the corporate veil. In the second count, the plaintiff alleged unjust enrichment. In the third count, the plaintiff sought damages under CUTPA. After a trial to the court, the court found in favor of the plaintiff against both defendants on the first count. On this count, the court rendered judgment in the total amount of $109,160.19. This amount consisted of the following: (1) $46,086.66 as the principal amount of the debt; (2) prejudgment interest of $11,544.34; (3) costs of $3128.19; (4) attorney's fees as allowed by the contract for electrical services in the amount of $39,960; (5) and an offer of judgment interest award of $7878, along with $350 for attorney's fees and $213 for costs. The court found in favor of the defendants on the second count because of its determination on the first count and found in favor of the defendants on the third count because it determined that the defendants' conduct did not rise to the level of a CUTPA violation.[1] These appeals followed.

The court found the following facts. The plaintiff is engaged in the business of selling electrical utility services to the public. Westview is a Connecticut limited liability corporation with its principal place of business at 45 East 89th Street, suite 10B, New York, New York. Sousa was the "sole owner, operator and member of Westview," and he resided at Westview's principal place of business.

Before moving to the United States, Sousa was an accountant in England, the qualifications for which were similar to those in the United States. After coming to the United States, Sousa worked in the accounting department of MCI Telecommunications Corporation,

---

[1] Technically, the court "dismissed" the second and third counts. We read this as essentially finding in favor of the defendants on those counts, as if the court had rendered judgment in favor of the defendants on those counts.

was a vice president of a semiconductor business in California and was a consultant in general business expansion to MCI Telecommunications Corporation in the late 1980s.

On April 25, 2000, Sousa formed Westview for the purpose of buying two buildings, consisting of 146 rental apartment units, located at 120 and 170 Hillside Avenue, Waterbury. Westview bought the properties on May 4, 2000, and at Westview's request, made by Sousa, the plaintiff began supplying electricity to the common areas of the apartment complex and any apartments owned by Westview.[2]

The court further found that state statutes and regulations require electrical companies such as the plaintiff to provide electrical services to owners of apartment buildings such as those owned by Westview. Further, such companies are prohibited from requiring the owner of such properties to post a security deposit, from eliciting a personal guarantee or from terminating service to the owner in the event of nonpayment of the bills for such service.

The only statutory remedy available to the plaintiff in the event of nonpayment for electrical service by an owner of an apartment building is to apply to the Superior Court for the appointment of a receiver of rents pursuant to General Statutes § 16-262f. The court noted that companies such as the plaintiff are reluctant to do so, however, because it is "expensive, time-consuming, confusing to the tenants, causes tenants to stop paying rent to anyone and can result in the electric utility becoming in effect the manager of the building."

---

[2] The written application for electrical service, submitted by Westview and signed by Sousa, provides for payment of all charges for such services, including costs and a reasonable attorney's fee incurred in collecting sums owed for the service.

Accordingly, companies such as the plaintiff, when dealing with a nonpaying owner, use the receivership process only as a last resort.

Westview's meters were located in a locked basement, requiring estimated bills to be sent until the plaintiff was able to gain access to them. From the outset of its ownership in May, 2000, Westview was delinquent in paying the monthly bills. It made no payment until August 11, 2000, and by September, 2000, the balance was more than $11,000. It made no further payments until March, 2001. Westview's history on its account was replete with demands for payment, unfulfilled promises of payment by Sousa and threats by the plaintiff of receivership.

Eventually, the plaintiff turned the account over for collection to its counsel, who notified Westview on May 20, 2002, that unless payment in full was received by June 4, 2002, an application for receiver of rents would be filed. Sousa received this letter but did not contact the plaintiff. Several days after June 4, 2002, the plaintiff served Westview with an application for receivership; the plaintiff was then informed that the property had been sold on June 3, 2002.

The court found that the plaintiff had proven a breach of contract by Westview and that as of September 3, 2002, the balance owed by Westview was $46,086.66. The court then turned to the plaintiff's claim that Sousa was personally liable for Westview's obligation to the plaintiff.

Specifically invoking the instrumentality test for piercing the corporate veil; see *Hersey* v. *Lonrho*, 73 Conn. App. 78, 87, 807 A.2d 1009 (2002); the court made the following findings. First, the court found that Sousa was not a credible witness; his testimony was inconsistent, evasive and contradicted by much other evidence, including his deposition. The court further found that he

was the sole owner, member and manager of Westview, which he formed for the sole purpose of owning the two buildings in question. His residence was Westview's principal place of business. He was in total control of all of Westview's operations and made all the decisions involving finances, policy and business practices. No state or federal tax returns were filed by Westview for the three tax years that Westview owned the buildings, and he intentionally failed to preserve Westview's financial records so that there was inadequate documentary support for his claim that Westview was a losing venture. Sousa's control and domination of all of Westview's affairs was such that as to the obligation to the plaintiff, Westview had no separate mind, will or existence of its own.

In addition, the court found that Sousa was aware of the governmental restrictions imposed on the plaintiff in doing business with owners of apartment buildings, such as Westview, and that the plaintiff could not refuse service, demand a personal guarantee from him or disconnect the meters in the event of nonpayment, and that the only action the plaintiff could take would be to apply for a receiver of rents. The court found that Sousa knew that the plaintiff was reluctant to do so and that he could stall the plaintiff from so applying by making partial payments and false promises of payment schedules. Sousa also began negotiating to sell the property while he was continuing to make promises of payment, he knew that the plaintiff was going to apply for a receiver on June 4, 2002, and he sold the property on June 3, 2002, without notifying the plaintiff or making any payment on the outstanding bill of $46,086.66. The effect of the sale was to leave Westview with no assets; there were funds available at the closing to pay the plaintiff's bill, and Sousa personally received approximately $74,000 from the proceeds of the sale. The court further found that "Sousa used his total control of the

affairs of Westview to perpetrate an unjust act in contravention of the plaintiff's legal rights, and that said control and conduct caused the plaintiff a loss of $46,086.66."

The court awarded the plaintiff prejudgment interest on this amount, pursuant to General Statutes § 37a-3, at the rate of 6 percent per year, commencing on November 1, 2002, to the date of judgment. It also awarded the plaintiff costs and attorney's fees on the basis of the application for service. See footnote 2.

Because it found in favor of the plaintiff against both defendants on the first count based on the contract, the court found in favor of the defendants on the second count, which was based on unjust enrichment. On the third count, which was based on CUTPA, the court found that "the conduct underlying the breach of contract by Westview, and the conduct of Sousa which the court has found sufficient to pierce Westview's corporate veil and hold Sousa personally liable for said breach of contract, does not rise to the level of a CUTPA violation." Accordingly, the court found in favor of the defendants on this count.

I

THE DEFENDANTS' APPEAL

A

Piercing the Corporate Veil

The defendants first claim that the court improperly concluded that Sousa was personally liable for Westview's breach of contract.[3] We disagree.

[3] The defendants separate this claim into two arguments: (1) the court improperly found Sousa liable for Westview's breach of contract and (2) the court improperly found Sousa liable under the contract for attorney's fees, interest and costs because Sousa signed the contract as president of Westview, and not as an individual. We consider both these arguments together because, contrary to the defendants' suggestion that they are severable, the same legal principles and factual findings govern both.

Whether the corporate veil should be pierced presents a question of fact, which we review under the clearly erroneous standard. *Litchfield Asset Management Corp.* v. *Howell*, 70 Conn. App. 133, 148, 799 A.2d 298, cert. denied, 261 Conn. 911, 806 A.2d 49 (2002). The instrumentality test for piercing the corporate veil, which the court applied in the present case, "requires, in any case but an express agency, proof of three elements: (1) Control, not mere majority or complete stock control, but complete domination, not only of finances but of policy and business practice *in respect to the transaction attacked* so that the corporate entity as to this transaction had at the time no separate mind, will or existence of its own; (2) that such control must have been used by the defendant to commit fraud or wrong, to perpetrate the violation of a statutory or other positive legal duty, or a dishonest or unjust act in contravention of plaintiff's legal rights; and (3) that the aforesaid control and breach of duty must proximately cause the injury or unjust loss complained of." (Emphasis in original; internal quotation marks omitted.) Id., 152.

"Courts, in assessing whether an entity is dominated or controlled, have looked for the presence of a number of factors. Those include: (1) the absence of corporate formalities; (2) inadequate capitalization; (3) whether funds are put in and taken out of the corporation for personal rather than corporate purposes; (4) overlapping ownership, officers, directors, personnel; (5) common office space, address, phones; (6) the amount of business discretion by the allegedly dominated corporation; (7) whether the corporations dealt with each other at arm's length; (8) whether the corporations are treated as independent profit centers; (9) payment or guarantee of debts of the dominated corporation; and (10) whether the corporation in question had property that was used by other of the corporations as if it were its own." (Internal quotation marks omitted.) Id., 152–53.

There was more than ample evidence to support the court's determination that under the instrumentality test, the corporate veil should be pierced in this case. In addition to, and in support of, the numerous specific factual findings made by the trial court, there was evidence that Westview lacked an agent for service as required by General Statutes §§ 34-121 and 34-104, filed no annual reports with the secretary of the state as required by General Statutes § 34-106 and lacked any of the documentation required for a limited liability corporation, as required by General Statutes § 34-144. In addition, there was evidence that Westview failed to maintain any business records for the property, failed to file tax returns for any of the years involved and was undercapitalized. There was also evidence that Sousa commingled Westview funds for his own benefit, by transferring funds from Westview to a different entity controlled by him, namely, the Clyde Group, for purported payment of undocumented and unsubstantiated loans. Finally, there was evidence that when Westview sold the property, Sousa, not the plaintiff, Westview's creditor, was the beneficiary of the $74,000 net proceeds of the sale.

Thus, we reject the defendants' suggestion that this was simply a case of a single shareholder being charged with a corporate debt solely because of his ownership status. There was ample evidence that Westview had no separate existence, that Sousa treated it as such and that Sousa used it to perpetrate an unjust act in contravention of the plaintiff's legal rights. The evidence in this case amply supports the court's determination that the corporate veil should be pierced.

B

Mitigation of Damages

The defendants next claim that the court improperly concluded that the plaintiff was not obligated to mitigate its damages by promptly applying for a receiver of

rents pursuant to § 16-262f.[4] Specifically, the defendants claim that because Westview breached the contract within the first two months of their relationship, and because by June, 2001, it was clear that Westview was not making its payments in full, the plaintiff should have mitigated its damages by applying for a receivership at that time.[5] We disagree.

The defendants' claim requires little discussion. A party being damaged has an obligation to make reasonable efforts to mitigate its damages, and the question of what constitutes such efforts is a question of fact that is subject to the clearly erroneous scope of review. *Vanliner Ins. Co.* v. *Fay*, 98 Conn. App. 125, 145, 907 A.2d 1220 (2006). The breaching party has the burden of proof on this issue. Id.

We agree with the court and the plaintiff that although § 16-262f affords an electric utility a means of mitigating its damages, it does not mandate that it do so regardless of the circumstances. The court's findings, which are amply supported by the evidence, support its determination that the plaintiff was not obligated to mitigate its damages by resorting to a rent receivership, which would have itself been expensive, time-consuming, and might well have resulted in tenants declining to pay rent at all. Furthermore, there was evidence that Sousa misrepresented to the plaintiff that he was working on

---

[4] General Statutes § 16-262f provides in relevant part: "(a) (1) Upon default of the owner, agent, lessor or manager of a residential dwelling who is billed directly by an electric, electric distribution, gas or telephone company or by a municipal utility for electric or gas utility service furnished to such building, such company or municipal utility or electric supplier providing electric generation services may petition the Superior Court or a judge thereof, for appointment of a receiver of the rents or payments for use and occupancy or common expenses . . . for any dwelling for which the owner, agent, lessor or manager is in default. . . ."

[5] As with their first claim, the defendants separate this claim into two parts. Also as with that claim, we treat both parts in one analysis because the same legal principles and facts govern both.

a long-term solution that would have afforded payment to the plaintiff. Instead, he sold the property without notifying the plaintiff and pocketed the net proceeds of the sale for himself.

## C

### Prejudgment Interest

The defendants' final claim is that the court improperly awarded prejudgment interest pursuant to § 37-3a (a).[6] This claim also requires little discussion. The trial court's award of interest pursuant to the statute for money wrongfully withheld was amply supported by the evidence and was not an abuse of discretion. See *McCullough* v. *Waterside Associates*, 102 Conn. App. 23, 33, 925 A.2d 352, cert. denied, 284 Conn. 905, 931 A.2d 264 (2007).

## II

### THE PLAINITFF'S CROSS APPEAL

The plaintiff, in its cross appeal, claims that the court improperly declined to find the defendants liable under CUTPA. Specifically, the plaintiff claims that the overwhelming evidence established that the defendants' conduct violated some or all of the three parts of the familiar "cigarette rule." See *Angiolillo* v. *Buckmiller*, 102 Conn. App. 697, 709, 927 A.2d 312, cert. denied, 284 Conn. 927, 934 A.2d 243 (2007). We reject this claim.

Whether conduct violates CUTPA is an issue of fact for the trial court. *De La Concha of Hartford, Inc.* v. *Aetna Life Ins. Co.*, 269 Conn. 424, 433–34, 849 A.2d 382 (2004). A reviewing court will direct a judgment for the plaintiff on a CUTPA claim only when the trial

---

[6] General Statutes § 37-3a (a) provides in relevant part: "Except as provided in sections 37-3b, 37-3c and 52-192a, interest at the rate of ten per cent a year, and no more, may be recovered and allowed in civil actions . . . as damages for the detention of money after it becomes payable. . . ."

court could not have reasonably reached its conclusion that there was no CUTPA violation. See id., 442; see also *Smith* v. *Greenwich*, 278 Conn. 428, 441, 899 A.2d 563 (2006).

In the present case, the court stated only that "the conduct underlying the breach of contract by Westview, and the conduct of Sousa, which the court has found sufficient to pierce the corporate veil and hold Sousa personally liable for said breach of contract, does not rise to the level of a CUTPA violation." The plaintiff did not ask the court to articulate its reasoning underlying this finding. On this state of the record, although the court could have found otherwise, we cannot say that the court acted unreasonably and in abuse of its discretion in concluding as it did. Put another way, it cannot be said that on this state of the record, a CUTPA violation was established as a matter of law.

The judgment is affirmed.

In this opinion the other judges concurred.