FRANK NAPLES ET AL. *v.* KEYSTONE BUILDING
AND DEVELOPMENT CORPORATION ET AL.
(SC 18397)

Rogers, C. J., and Norcott, Katz, Palmer, Vertefeuille, Zarella and McLachlan, Js.

Argued January 6—officially released March 30, 2010

*Vincent F. Sabatini*, for the appellants (plaintiffs).

*Donald Gaudreau*, with whom was *Patricia Groves*, for the appellees (defendants).

*Opinion*

NORCOTT, J. The plaintiffs, Frank Naples and Karen Naples, brought this action against the named defendant, Keystone Building and Development Corporation, its successor entity, Keystone Builders and Developers, LLC (Keystone, LLC),[1] and their principal, Leonard Bourbeau, alleging that their poor workmanship in the construction of the plaintiffs' new home constituted, inter alia, breach of contract, and violated the New Home Warranties Act (warranties act), General Statutes § 47-116 et seq., and the Connecticut Unfair Trade Practices Act (CUTPA), General Statutes § 42-110a et seq. After a trial to the court, the trial court rendered judgment for the plaintiffs in the amount of $59,140.40. The plaintiffs appeal[2] from this judgment, claiming that the trial court improperly failed to: (1) award them damages in an amount sufficient to repair their home; (2) find that the defendants had violated CUTPA; (3) pierce the corporate veil and hold Bourbeau individually liable for his negligence; and (4) find that the defendants had been unjustly enriched. We agree with the plaintiffs' damages claim, but disagree with their other claims. Accordingly, we reverse the judgment of the trial court in part and remand the case for a new trial limited to damages.

The record reveals the following relevant facts, as found by the trial court and set forth in its memorandum

---

[1] Keystone, LLC, is the corporate successor to the named defendant, which is the entity that had contracted with the plaintiffs to build their home. The parties have stipulated that Keystone, LLC, will be responsible for any damages that otherwise would have been paid by the named defendant.

[2] The plaintiffs appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

of decision, and procedural history. On November 17, 2000, the plaintiffs entered into a contract with the named defendant, signed by Bourbeau, to construct a single-family home in Glastonbury for a contract price of $620,500.[3] The contract provided in relevant part that "[e]very attempt has been made to use the finest materials available to produce the highest quality home possible," and contained a one year limited warranty against defects in material and workmanship. The contract further provided that the home's "[s]iding shall consist of [one-half inch by six inch] beveled cedar clapboards and pine trim applied over Tyvek house [wrap] or similar."[4] Although not all of the work had been completed on the home, the plaintiffs took possession of it by warranty deed and moved in on December 21, 2001.

In the spring of 2002, the plaintiffs began to notice numerous problems with their new home, including peeling paint, mold on trim boards, leaking windows in the kitchen, master bedroom and bathroom, rotting wood trim, stress fractures in the sheetrock walls and other signs of water damage. The plaintiffs sent the defendants numerous lists outlining the various problems. Bourbeau came to the plaintiffs' home two or three times and also sent a subcontractor to address some of the issues. The problems persisted, even after the defendants replaced trim boards and recaulked areas of the exterior in response to a July, 2004 report by a claims adjuster sent by the plaintiffs' home insurer.[5]

---

[3] After subsequent changes to the contract specifications, the plaintiffs ultimately paid approximately $680,000 for their home.

[4] Tyvek is a synthetic material that protects a structure from the elements during the construction process, and later serves to keep exterior air and moisture from penetrating the walls of a completed building while also permitting indoor moisture to escape.

[5] The plaintiffs' home insurer denied their claim for coverage pursuant to policy exclusions for wear and tear, and faulty or defective design, construction or workmanship.

Robert Dykins, a builder of residential homes in the Glastonbury area with more than twenty-three years of experience, opined in expert testimony credited by the trial court that the home's problems were caused by poor workmanship, specifically, the improper installation of window flashings and exterior trim in a manner that caused water to enter the home, as well as gaps in the siding and the Tyvek barrier that lay underneath.[6] Dykins testified that, to remedy the problems with the home, the windows and new flashings would need to be reinstalled in a proper manner to direct water away from the house, new wood exterior trim would need to be installed to the same effect, the master bedroom window would need to be replaced and a new Tyvek barrier and siding would need to be installed. Repainting was required, as well.

The plaintiffs brought this action in a twelve count complaint seeking compensatory, incidental and punitive damages, and attorney's fees and costs. The plaintiffs alleged that the problems with their home, and the defendants' failure to correct them, constituted, on the part of the named defendant: (1) breach of contract; (2) unjust enrichment; (3) fraud and intentional misrepresentation; (4) intentional misrepresentation by nondisclosure; and (5) negligent misrepresentation. In the sixth count, the plaintiffs claimed that Keystone, LLC, had engaged in fraud and intentional misrepresentation, and in the seventh count, the plaintiffs alleged that all defendants had violated the Uniform Fraudulent Transfer Act (transfer act), General Statutes § 52-552a et seq. In the eighth and ninth counts, the plaintiffs raised claims of negligence, fraud and misrepresentation against Bourbeau individually. Finally, the tenth, eleventh and twelfth counts were brought against all of the

---

[6] Both Dykins and Justin Farnsworth, a product specialist for the wholesaling company that sold the Tyvek barrier used on the plaintiffs' home, testified that the Tyvek barrier had not been installed properly because its seams did not overlap and were not taped together.

defendants, seeking to pierce the corporate veils of the named defendant and Keystone, LLC, and alleging violations of the warranties act and CUTPA. The defendants filed an answer denying the plaintiffs' allegations, as well as special defenses asserting that the plaintiffs' claims were barred by the applicable statutes of limitations, and also by the doctrine of laches.

Following a trial, the trial court filed a memorandum of decision that began with the tenth count of the complaint and rejected the plaintiffs' piercing the corporate veil claim.[7] The court determined that both the named defendant and Keystone, LLC, served a legitimate business purpose and, accordingly, that Keystone, LLC, was the proper defendant in the present case. See footnote 1 of this opinion. Consistent with its prior oral decision; see footnote 7 of this opinion; the trial court similarly disagreed with the plaintiffs' transfer act claim, concluding that Keystone, LLC, had not been formed with the intention of avoiding a debt or legal duty. The trial court then rejected the defendants' special defenses[8]

---

[7] In response to an oral motion made by the defendants at the conclusion of the plaintiffs' case, the trial court ruled that the only remaining claims were counts one, two, eight, and ten through twelve of the amended complaint. These surviving claims were, respectively, breach of contract and unjust enrichment against the named defendant, negligence as to Bourbeau, the count seeking to pierce the corporate veil against all of the defendants, and the counts alleging violations of the warranties act and CUTPA against all defendants. The court's oral ruling rendered judgment for the defendants on counts three through seven, as well as count nine, of the amended complaint, which had alleged against the named defendant fraud and intentional misrepresentation, intentional misrepresentation by nondisclosure, and negligent misrepresentation, as well as fraud and intentional misrepresentation against Keystone, LLC, violations of the transfer act against all defendants, and fraud and misrepresentation against Bourbeau personally. The trial court's conclusions relating to these claims have not been challenged on appeal.

[8] The trial court concluded that the continuing course of conduct doctrine barred the defendants' laches and statute of limitations defenses because Bourbeau's actions in returning to the plaintiffs' home several times to correct the defects acted to toll the statute of limitations. This conclusion is not at issue in this appeal.

and concluded, on the basis of Dykins' "unrefuted"[9] testimony concerning the improper installation of the siding, exterior trim and Tyvek barrier on the plaintiffs' home, that the defendants had breached the contract, as well as the statutory and contractual warranties. The court then concluded that this finding also resolved the plaintiffs' unjust enrichment claim and rejected the plaintiffs' claim that the defendants' conduct constituted a CUTPA violation, concluding that the defendants only had committed a "simple breach of contract," rather than acting unethically, unscrupulously, wilfully or recklessly.

With respect to the plaintiffs' damages, the trial court utilized the reasonable cost of construction method to determine the damages caused by the breach of the construction contract. The trial court noted that Dykins' $113,511.48 repair estimate,[10] and the plaintiffs' painting estimate of $15,818.75,[11] were the only damages evi-

[9] The defendants presented an expert witness, Jonathan Van Dine, an engineer who worked in the field of environmental problems with residences, including moisture and mold. The trial court noted that Van Dine testified that his inspection of the residence revealed moisture problems in the residence, specifically peeling paint and mildew, and that Van Dine's testimony did not contradict Dykins' testimony.

[10] Dykins' $113,511.48 estimate was comprised of the following items: "Demolition": "Removal from house of existing siding and exterior trim," $14,850.

"Windows": "New master bedroom window with trim on interior and exterior to match existing," $670.

"Materials": "Exterior trim and casework on house, around doors and windows," $12,688.40.

"Materials": "Lap cedar siding to re-side house," $17,497.

"Labor rot repair": "Estimated labor to replace exterior trim and siding," $46,750.

"Roofing": "The following estimate to replace roofing . . . disturbed to reinsulate, [r]e-roof and tie into existing house, roofing material to match existing," $1237.50.

"Dump fee": "Cost to remove construction refuse," $900.

"Construction cost": $94,592.90.

"Overhead": "Profit and overhead," $18,918.58.

[11] The plaintiffs' $15,818.75 painting estimate was comprised of the following items: "Exterior Painting": "Entire house will be [p]ower [w]ashed prior to painting or staining," $350.

dence offered at trial. The court then found that, "based on the credible evidence . . . the main corrective work is needed because of the improper installation of the siding and the moisture barrier (Tyvek) under the siding, and therefore replacement of the moisture barrier and existing siding are warranted," along with painting the new wood siding and trim. The trial court next found that the plaintiffs were entitled to all amounts in the estimates except for Dykins' estimate of $46,750 for labor to replace the trim and siding, and $18,918.55 for profit and overhead, because those items had "not been established with a sufficient degree of certainty . . . ." Accordingly, the trial court rendered judgment for the plaintiffs against Keystone, LLC, in the amount of $59,140.40 The trial court later denied the plaintiffs' subsequent motion for reargument. This appeal followed.[12]

On appeal, the plaintiffs challenge several of the trial court's factual findings and claim that the court improperly failed to: (1) award them the entire costs needed to repair their home, in particular the labor costs, profit and overhead estimate, and costs for painting, insulation and a replacement Pella window; (2) find that the defendants had violated CUTPA; (3) pierce the corpo-

"Exterior Painting": "All new exterior [t]rim (excludes trim in front entrance door area)—[a]ll new trim will have nail holes filled and receive one complete coat of Cabot white Problem Solver primer. All trim will receive one complete coat of Benjamin Moore or Cabot white exterior losheen trim paint," $9460.

"Exterior Painting": "All exterior [s]iding and [d]oors will receive one complete coat of Benjamin Moore or Cabot solid color stain or soft gloss trim paint ([d]oors). Colors to match original," $3520.

"Materials Estimate": "Estimate of all trim paint materials," $325.

"Materials Estimate": "Estimate of all [s]iding and [d]oor materials," $450.

"Int[erior] Painting": "Ceiling repairs and painting for [mud room, kitchen, family room and living room (labor and materials)]," $1713.75.

[12] The defendants subsequently filed a cross appeal from the judgment of the trial court. Prior to the appeals being transferred to this court; see footnote 2 of this opinion; the Appellate Court granted the plaintiffs' motion to dismiss the cross appeal. That dismissal is not at issue in this appeal.

rate veil and hold Bourbeau liable individually for his negligence; and (4) find that the defendants have been unjustly enriched. We address each claim in turn and set forth additional relevant facts when necessary in the context of each claim.

I

We begin with the plaintiffs' claim that the trial court improperly failed to award them the full cost required to repair their home. Specifically, the plaintiffs argue that the trial court improperly declined to credit the portions of Dykins' testimony and his report that estimated the labor cost of replacing the siding at $46,750, and also declined to award damages for interior painting, compensation for unknown damages ranging from $12,000 to $18,000, costs for insulation and a replacement Pella window. The plaintiffs claim that the trial court's award is illogical and that a proper damages award in this case would be $148,540.23. In response, the defendants contend that the trial court was not obligated to accept all of the estimates in their entirety and that we should defer to the trial court's assessment of Dykins' credibility and the weight of the evidence. The defendants further emphasize that the trial court properly considered Dykins' testimony to be speculative and uncertain on the bases of his limited inspection of the house and his inclusion of a range of an extra $12,000 to $18,000 for indeterminate "[u]nknown [d]amages." We agree with the plaintiffs and conclude that the trial court's damages finding was clearly erroneous to the extent that it failed to compensate them for the estimated labor, painting, insulation and replacement window costs for the repair of their home.[13]

---

[13] As a result of our conclusion with respect to the damages issue, we need not reach the plaintiffs' claim that the trial court improperly applied a standard of proof higher than the preponderance of the evidence standard in its damages determination.

"As a general rule, in awarding damages upon a breach of contract, the prevailing party is entitled to compensation which will place [it] in the same position [it] would have been in had the contract been properly performed. . . . Such damages are measured as of the date of the breach. . . . For a breach of a construction contract involving defective or unfinished construction, damages are measured by computing either (i) the reasonable cost of construction and completion in accordance with the contract, if this is possible and does not involve unreasonable economic waste; or (ii) the difference between the value that the product contracted for would have had and the value of the performance that has been received by the plaintiff, if construction and completion in accordance with the contract would involve unreasonable economic waste." (Citations omitted; internal quotation marks omitted.) *Levesque* v. *D & M Builders, Inc.*, 170 Conn. 177, 180–81, 365 A.2d 1216 (1976). The court may consider evidence demonstrating that the repairs undertaken by the plaintiff were necessary to restore the facility to the condition that it would have been in had it been constructed as warranted. *Willow Springs Condominium Assn., Inc.* v. *Seventh BRT Development Corp.*, 245 Conn. 1, 61, 717 A.2d 77 (1998). "The repairs, however, may not result in improvements to the property, in the sense that they may not be of a different and superior type than they would have been had they been constructed as warranted." *O & G Industries, Inc.* v. *All Phase Enterprises, Inc.*, 112 Conn. App. 511, 529, 963 A.2d 676 (2009).

"The plaintiff has the burden of proving the extent of the damages suffered. . . . Although the plaintiff need not provide such proof with [m]athematical exactitude . . . the plaintiff must nevertheless provide sufficient evidence for the trier to make a fair and reasonable estimate. . . . As we have stated previously, the deter-

mination of damages is a matter for the trier of fact . . . ." (Citations omitted; internal quotation marks omitted.) *Willow Springs Condominium Assn., Inc.* v. *Seventh BRT Development Corp.*, supra, 245 Conn. 65. Accordingly, we review the trial court's damages award under the clearly erroneous standard, under which we overturn a finding of fact "when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (Internal quotation marks omitted.) *O & G Industries, Inc.* v. *All Phase Enterprises, Inc.*, supra, 112 Conn. App. 532.

We conclude that the trial court's damages award was clearly erroneous because of its failure to award the plaintiffs damages adequate to pay for the labor necessary to replace the trim and siding, as well as to repair and repaint damaged portions of the home's interior. Although the trial court specifically found that "the amounts in Dykins' estimate of $46,750 for labor to replace trim and siding, and $18,918.58 for profit and overhead ha[d] not been established with a sufficient degree of certainty," the court did not point to any conflicting evidence or explain why it elected to discredit those discrete portions of the estimate while accepting the others verbatim. The apparent illogic in the award leaves us with a definite and firm conviction that a mistake has been committed; in awarding the plaintiffs $17,497 for the cost of new siding materials, the trial court plainly credited Dykins' testimony that it was necessary to install new siding on the home after fixing the leaks, yet it failed to compensate the plaintiffs for the expense of installing those new materials on the house.[14] Moreover, there is no evidence in the record

---

[14] The apparent reasonableness of Dykins' labor estimate is supported by his uncontradicted testimony that removing the trim alone would take four or five workers five to six weeks, and possibly longer given the landscaping around the plaintiffs' home.

contradicting the reasonableness of that specific figure, as well as the separate claimed profits and overhead amount of $18,918.58; indeed, the defendants did not even argue this point in the damages section of their trial brief.[15] Thus, we conclude that a new trial limited to the issue of damages is necessary to ensure that the plaintiffs are compensated adequately for the damages caused by the defendants' breach of the contract and the warranties act.[16]

## II

We next turn to the plaintiffs' claim that the trial court improperly failed to find that the defendants had violated CUTPA. Relying on, inter alia, *Willow Springs Condominium Assn., Inc.* v. *Seventh BRT Development Corp.*, supra, 245 Conn. 1, and *Tessmann* v. *Tiger Lee*

---

[15] Conceivably, the trial court could have found Dykins' profits and overhead estimate of $18,918.58 to be speculative and, therefore, insufficient, as Dykins did not explain it in either his testimony or written estimate. See *Viejas Band of Kumeyaay Indians* v. *Lorinsky*, 116 Conn. App. 144, 163, 976 A.2d 723 (2009) ("[e]vidence is considered speculative when there is no documentation or detail in support of it and when the party relies on subjective opinion"). Nevertheless, in the absence of attack on this component amount by the defendants—whose damages argument before the trial court focused on the fact that the claimed damages in toto approached 25 percent of the value of the home—it strikes us as illogical to deny entirely the plaintiffs the resources they need to have repair work, which the trial court found necessary, performed on their home.

[16] As the plaintiffs point out, the trial court's damages award also does not compensate them for the $1713.75 estimated cost of repairing the ceilings inside the home, and repainting the damaged surfaces in the mud room, kitchen, family room and living room, the $1085 cost of installing new insulation in the ceiling or $125 for a replacement Pella window. The trial court also did not address the additional $12,000 to $18,000 in separate structural damage caused by water leakage that Dykins opined existed in the sheathing at the corners of the home and around the windows. These omissions conceivably may be an oversight, as the trial court did not specifically reject the sums stated, as it did with Dykins' estimates of the labor costs and profit and overhead. Indeed, although the plaintiffs raised these sums in the damages section of their trial brief, they too did not mention them in their motion for reargument. Accordingly, on retrial, the trial court's revised damages award should account for these claimed items.

*Construction Co.*, 228 Conn. 42, 634 A.2d 870 (1993), the plaintiffs claim that the defendants' breach of the contract and the warranties act required a finding of a CUTPA violation, particularly because the defendants' shoddy construction techniques were compounded by their failure to disclose to the plaintiffs the full extent of the problems with the home, as well as subsequent delays in repairing the problems. In response, the defendants rely on *Hudson United Bank* v. *Cinnamon Ridge Corp.*, 81 Conn. App. 557, 845 A.2d 417 (2004), and contend that the trial court properly found that this was a simple breach of contract case that lacked the unethical behavior or other aggravating factors necessary to rise to the level of a CUTPA violation. We agree with the defendants and conclude that the trial court's finding that their actions did not constitute a CUTPA violation was not clearly erroneous.

CUTPA provides: "No person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." General Statutes § 42-110b (a). "It is well settled that in determining whether a practice violates CUTPA we have adopted the criteria set out in the cigarette rule by the [F]ederal [T]rade [C]ommission for determining when a practice is unfair: (1) [W]hether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise—in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers, [competitors or other businesspersons]. . . . All three criteria do not need to be satisfied to support a finding of unfairness. A practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets

all three." (Internal quotation marks omitted.) *Votto* v. *American Car Rental, Inc.*, 273 Conn. 478, 484, 871 A.2d 981 (2005).

Moreover, "not every contractual breach rises to the level of a CUTPA violation." *Hudson United Bank* v. *Cinnamon Ridge Corp.*, supra, 81 Conn. App. 571; see also *Lydall, Inc.* v. *Ruschmeyer*, 282 Conn. 209, 247, 919 A.2d 421 (2007) (defendant employee's breach of employment agreement and attempted takeover of plaintiff publicly traded corporation was insufficient to establish CUTPA violation in absence of showing that employee's attempted takeover was "in and of itself" unlawful); *IN Energy Solutions, Inc.* v. *Realgy, LLC*, 114 Conn. App. 262, 274–75, 969 A.2d 807 (2009) (breach of sales contract did not constitute CUTPA violation when trial court "specifically found that [the plaintiff] did not prove that [the defendant's] conduct in failing to pay commissions [pursuant to the contract] was unethical, unscrupulous, wilful or reckless"); accord *Tessmann* v. *Tiger Lee Construction Co.*, supra, 228 Conn. 55 (upholding CUTPA punitive damages award when "[t]he defendants' actions clearly r[o]se above simple negligence and support[ed] a finding of reckless or intentional conduct by the defendants to the plaintiffs' detriment").

"It is well settled that whether a defendant's acts constitute . . . deceptive or unfair trade practices under CUTPA, is a question of fact for the trier, to which, on appellate review, we accord our customary deference. . . . [W]here the factual basis of the court's decision is challenged we must determine whether the facts set out in the memorandum of decision are supported by the evidence or whether, in light of the evidence and the pleadings in the whole record, those facts are clearly erroneous." (Internal quotation marks omitted.) *IN Energy Solutions, Inc.* v. *Realgy, LLC*, supra, 114 Conn. App. 274.

We conclude that the trial court's determination that the defendants' conduct did not amount to a CUTPA violation was not clearly erroneous, notwithstanding their unworkmanlike construction of the plaintiffs' home. In rejecting the plaintiffs' CUTPA claim, the trial court reasonably could have relied on testimony that Bourbeau and one of his subcontractors had attempted multiple times, albeit unsuccessfully, to remedy the damage and problems about which the plaintiffs had complained. Indeed, Karen Naples testified that Bourbeau had expressed his desire to resolve the construction dispute without resort to litigation. In the absence of aggravating unscrupulous conduct, mere incompetence does not by itself mandate a trial court to find a CUTPA violation.[17] Cf. *Tessmann* v. *Tiger Lee Construction Co.*, supra, 228 Conn. 54–55 (contractor's actions constituted reckless disregard of homeowners' rights justifying punitive damage award under CUTPA when it: [1] represented that it would perform all work with its own employees, but instead relied completely on subcontractors, and refused to try to fix leaks, claiming they were "merely condensation"; [2] told homeowners to set traps to solve problem of rodents entering through hole in wall; and [3] buried paint cans and "other nox-

---

[17] The plaintiffs rely on *Willow Springs Condominium Assn., Inc.* v. *Seventh BRT Development Corp.*, supra, 245 Conn. 1, in support of their claim that "[t]here is case law in Connecticut that holds specifically that a violation of the [warranties act] is a violation of CUTPA." To the extent that the plaintiffs claim that a violation of the warranties act is a per se CUTPA violation, we disagree. Unlike the Home Improvement Act; General Statutes § 20-418 et seq.; which provides specifically that a violation "shall be deemed an unfair or deceptive trade practice under subsection (a) of section 42-110b"; General Statutes § 20-427 (c); the warranties act contains no such per se provision. Moreover, *Willow Springs Condominium Assn., Inc.*, is distinguishable from the present case because in *Willow Springs Condominium Assn., Inc.*, the trial court made factual findings that the builder fraudulently had concealed ongoing problems with a sewage treatment plant on the site of a newly constructed condominium complex. See *Willow Springs Condominium Assn., Inc.* v. *Seventh BRT Development Corp.*, supra, 40–44.

ious materials . . . in a wetland near [the home's] well"); *Centimark Corp.* v. *Village Manor Associates Ltd. Partnership*, 113 Conn. App. 509, 523–24, 967 A.2d 550 (upholding finding of CUTPA violation in case arising from faulty roofing work when general contractor represented that work would be done by "Master Elite" roofing subcontractor, and then failed to inform owner that task would be delegated to another, less qualified subcontractor), cert. denied, 292 Conn. 907, 973 A.2d 103 (2009); *Scrivani* v. *Vallombroso*, 99 Conn. App. 645, 649–50, 916 A.2d 827 (trial court properly found CUTPA violations, both per se under Home Improvement Act; General Statutes § 20-418 et seq.; and independently on basis of contractor's false representation of qualifications with respect to installation of siding, and also his "pressur[ing of] the plaintiffs for payment in full before he had completed work so as to preclude them from raising the Home Improvement Act in defense of any suit for payment that he might bring" [internal quotation marks omitted]), cert. denied, 282 Conn. 904, 920 A.2d 309 (2007); *Kronberg Bros., Inc.* v. *Steele*, 72 Conn. App. 53, 61–62, 804 A.2d 239 (trial court properly found CUTPA violations, both per se under Home Improvement Act, and independently on basis of contractor's failure to obtain building permits, despite billing customers for permits, and sealing live wires behind closed walls in multiple locations in house), cert. denied, 262 Conn. 912, 810 A.2d 277 (2002); but see *Krawiec* v. *Blake Manor Development Corp.*, 26 Conn. App. 601, 606, 602 A.2d 1062 (1992) (breach of "implied statutory warranties that the drainage system would be installed according to sound engineering standards, and that the house would be constructed on the lot in a workmanlike manner and would be fit for habitation" also rendered trial court's finding of CUTPA violation not clearly erroneous). Given the support in the record for the trial court's finding that the defendants' actions constituted

nothing other than mere incompetence, we conclude that its determination that they did not violate CUTPA was not clearly erroneous.[18]

### III

The plaintiffs next claim that the trial court improperly rejected their claim, under both the "instrumentality" and "identity" tests, that Keystone, LLC, was a "mere shell," whose corporate veil should be pierced to allow the plaintiffs' to hold Bourbeau individually liable for his negligence. The plaintiffs contend that the record reveals that "Bourbeau is [Keystone, LLC] and [Keystone, LLC] is . . . Bourbeau," and that Bourbeau improperly is attempting to hide behind Keystone, LLC, whose affairs he dominates. Despite the defendants' briefing of this issue, which is sparse to the brink of inadequacy, we agree with their contention that the trial court's finding on this issue is supported by evidence in the record, and is, therefore, not clearly erroneous.

"Courts will . . . disregard the fiction of a separate legal entity to pierce the shield of immunity afforded by the corporate structure in a situation in which the corporate entity has been so controlled and dominated that justice requires liability to be imposed on the real actor. . . . We have affirmed judgments disregarding the corporate entity and imposing individual stock-

---

[18] In support of their CUTPA claim, the plaintiffs also rely on the fact that the defendants had failed to disclose to the plaintiffs that, two months after the completion of construction, Bourbeau had ceased doing business through the named defendant, electing on the advice of his accountant and attorney to simplify his business filings by using a new entity, Keystone, LLC. Given the fact that Bourbeau continued to interact with the plaintiffs and attempted to address the problems with their home, and his testimony that nothing had changed operationally with his business after the change in entity, the trial court reasonably could have determined that this organizational change was not a fact that required it to find a CUTPA violation, particularly given the parties' stipulation that Keystone, LLC, will be responsible for and pay any damages that otherwise would have been paid by the named defendant. See footnote 1 of this opinion.

holder liability when a corporation is a mere instrumentality or agent of another corporation or individual owning all or most of its stock. . . .

"In *Zaist* [v. *Olson*, 154 Conn. 563, 578, 227 A.2d 552 (1967)], we found the controlling stockholder and a related corporation liable under an alter ego theory, concluding that the corporate structure of the defendant in that case could properly have been disregarded under either the instrumentality rule or the identity rule. . . .

"The instrumentality rule requires, in any case but an express agency, proof of three elements: (1) Control, not mere majority or complete stock control, but complete domination, not only of finances but of policy and business practice in respect to the transaction attacked so that the corporate entity as to this transaction had at the time no separate mind, will or existence of its own; (2) that such control must have been used by the defendant to commit fraud or wrong, to perpetrate the violation of a statutory or other positive legal duty, or a dishonest or unjust act in contravention of [the] plaintiff's legal rights; and (3) that the aforesaid control and breach of duty must proximately cause the injury or unjust loss complained of. . . .

"The identity rule has been stated as follows: If [the] plaintiff can show that there was such a unity of interest and ownership that the independence of the corporations had in effect ceased or had never begun, an adherence to the fiction of separate identity would serve only to defeat justice and equity by permitting the economic entity to escape liability arising out of an operation conducted by one corporation for the benefit of the whole enterprise." (Citations omitted; internal quotation marks omitted.) *Angelo Tomasso, Inc.* v. *Armor Construction & Paving, Inc.*, 187 Conn. 544, 552–54, 447 A.2d 406 (1982).

"Courts, in assessing whether an entity is dominated or controlled, have looked for the presence of a number of factors. Those include: (1) the absence of corporate formalities; (2) inadequate capitalization; (3) whether funds are put in and taken out of the corporation for personal rather than corporate purposes; (4) overlapping ownership, officers, directors, personnel; (5) common office space, address, phones; (6) the amount of business discretion by the allegedly dominated corporation; (7) whether the corporations dealt with each other at arm's length; (8) whether the corporations are treated as independent profit centers; (9) payment or guarantee of debts of the dominated corporation; and (10) whether the corporation in question had property that was used by other of the corporations as if it were its own." (Internal quotation marks omitted.) *Litchfield Asset Management Corp.* v. *Howell*, 70 Conn. App. 133, 152–53, 799 A.2d 298, cert. denied, 261 Conn. 911, 806 A.2d 49 (2002).

"The concept of piercing the corporate veil is equitable in nature. . . . No hard and fast rule, however, as to the conditions under which the entity may be disregarded can be stated as they vary according to the circumstances of each case." (Citations omitted; internal quotation marks omitted.) *Angelo Tomasso, Inc.* v. *Armor Construction & Paving, Inc.*, supra, 187 Conn. 555–56. "Ordinarily the corporate veil is pierced only under exceptional circumstances, for example, where the corporation is a mere shell, serving no legitimate purpose, and used primarily as an intermediary to perpetuate fraud or promote injustice." (Internal quotation marks omitted.) Id., 557. The improper use of the corporate form is the key to the inquiry, as "[i]t is true that courts will disregard legal fictions, including that of a separate corporate entity, when they are used for fraudulent or illegal purposes. Unless something of the kind is proven, however, to do so is to act in opposi-

tion to the public policy of the state as expressed in legislation concerning the formation and regulation of corporations." (Internal quotation marks omitted.) Id., 559.

Whether the circumstances of a particular case justify the piercing of the corporate veil "presents a question of fact." Id., 561; see also id., 556 n.7 (describing resolution of veil piercing cases as "particularly within the province of the trial court" since "each case in which the issue is raised should be regarded as sui generis" [internal quotation marks omitted]). Accordingly, we review the trial court's decision whether to pierce Keystone, LLC's corporate veil under the clearly erroneous standard of review. Id., 561–62; see also, e.g., *Labbe* v. *Carusone*, 115 Conn. App. 832, 837, 974 A.2d 738 (2009); *Litchfield Asset Management Corp.* v. *Howell*, supra, 70 Conn. App. 148.

The case law applying the principles articulated in the leading case of *Angelo Tomasso, Inc.* v. *Armor Construction & Paving, Inc.*, supra, 187 Conn. 544, is illustrative with respect to the equitable nature of piercing the corporate veil, and shows that courts decline to pierce the veil of even the closest corporations in the absence of proof that failure to do so will perpetrate a fraud or other injustice. Compare *Campisano* v. *Nardi*, 212 Conn. 282, 293–94, 562 A.2d 1 (1989) (rejecting attempt to hold principal of dissolving construction corporation personally liable for breach of contract when "[t]he plaintiffs do not claim that the [principal] used his control over the corporation in order to commit or to avoid liability for any personal wrongful act"), and *Lewis* v. *Frazao Building Corp.*, 115 Conn. App. 324, 336–37, 972 A.2d 284 (2009) (upholding finding of fact declining to pierce corporate veil because, although construction company left incomplete work, "there was no wrongful or deceitful intent on its part" or principal's part, and even if princi-

pal "did have complete control of [the construction company] no fraud was committed that resulted in an injury to the plaintiff"), with *Connecticut Light & Power Co.* v. *Westview Carlton Group, LLC,* 108 Conn. App. 633, 638–41, 950 A.2d 522 (2008) (proper to pierce corporate veil when principal was sole owner and manager of corporation that never filed corporate tax returns, lacked financial records to prove claim that it was losing venture, and then sold apartment buildings with principal's knowledge of power company's intention to file motion to be made receiver of rents and transferred all proceeds to its principal, leaving corporation without assets to pay electric bills).[19]

Thus, viewing the plaintiffs' claims in light of these cases, we disagree with their argument that the trial court improperly failed to find that they had proven, under the instrumentality test, that Keystone, LLC's corporate veil should be pierced and Bourbeau held per-

---

[19] Compare also *Labbe* v. *Carusone,* supra, 115 Conn. App. 838–39 (declining to pierce corporate veil because property transfer from corporation to principal was not made fraudulently or with knowledge of pending personal injury action), with *Litchfield Asset Management Corp.* v. *Howell,* supra, 70 Conn. App. 153–58 (upholding conclusion finding new limited liability companies and their principal liable for debt against principal and her former limited liability company because she had used corporate funds for personal purposes and also had transferred funds from older limited liability company to new limited liability companies before plaintiff judgment creditor could enforce in Connecticut judgment obtained in Texas), and *Davenport* v. *Quinn,* 53 Conn. App. 282, 302–303, 730 A.2d 1184 (1999) (upholding pierce of corporate veil given lack of corporate formalities, principal's exclusive control over two corporations, free transfers of money between corporations and principal's personal accounts, including $75,000 after plaintiff filed original complaint in personal injury action, and postjudgment property execution showed that corporation had insufficient funds to satisfy judgment), and *Falcone* v. *Night Watchman, Inc.,* 11 Conn. App. 218, 220–23, 526 A.2d 550 (1987) (affirming judgment piercing corporate veil of closely held restaurant corporation because principal owned 100 percent of stock, corporation had no assets of its own, he had promised vendor that he would assume personal responsibility for unpaid corporate bills, and corporate formalities were not observed until business closed and claim had been filed against principal).

sonally liable for damages in the present case. Although it is clear that the plaintiffs have satisfied the first element of the instrumentality test, namely, that Bourbeau controlled the affairs of Keystone, LLC,[20] their claim fails with respect to the second and third elements, namely, that Bourbeau used that control "to commit fraud or wrong, to perpetrate the violation of a statutory or other positive legal duty, or a dishonest or unjust act in contravention of [the] plaintiff's legal rights . . . and . . . that the aforesaid control and breach of duty must [have] proximately cause[d] the injury or unjust loss complained of." (Internal quotation marks omitted.) *Angelo Tomasso, Inc.* v. *Armor Construction & Paving, Inc.*, supra, 187 Conn. 553. The plaintiffs do not point to any evidence that Keystone, LLC, did not serve a legitimate business purpose, or that failing to pierce its corporate veil and hold Bourbeau personally responsible would perpetrate a fraud or other injustice, such as by wrongfully denying them compensation for the damages occasioned by the contractual and warranty breaches. See, e.g., *Campisano* v. *Nardi*, supra, 212 Conn. 293 (rejecting "proposition that the instrumentality rule is triggered whenever individual control of a corporation is coupled with a breach of contract by the corporation").

For the same reasons, the plaintiffs' claims also fail under the identity rule, pursuant to which they were required to "show that there was such a unity of interest and ownership that the independence of the corporations had in effect ceased or had never begun, an adherence to the fiction of separate identity would serve *only to defeat justice and equity by permitting the economic entity to escape liability* arising out of an operation

---

[20] We acknowledge the plaintiffs' reliance on the close relationship between Bourbeau's personal finances and those of his business, as well as his failures to comply with corporate formalities by keeping corporate minutes and other records, such as an operating agreement.

conducted by one corporation for the benefit of the whole enterprise." (Emphasis added; internal quotation marks omitted.) *Angelo Tomasso, Inc.* v. *Armor Construction & Paving, Inc.,* supra, 187 Conn. 554. Although the identity rule is applicable against individuals, as well as corporations; see, e.g., *KLM Industries, Inc.* v. *Tylutki,* 75 Conn. App. 27, 33 n.3, 815 A.2d 688, cert. denied, 263 Conn. 916, 821 A.2d 770 (2003); and there is ample evidence linking Bourbeau's financial affairs with those of Keystone, LLC, the plaintiffs again fail to point to evidence that declining to pierce the corporate veil would defeat justice by leaving them without compensation for the breach of the construction contract. Put differently, the fact that Bourbeau "acted on behalf of [Keystone, LLC] is no more than a reflection of the reality that all corporations act through individuals. It is axiomatic that while such an entity has a distinct legal life, it can act only through individuals." Id., 35. Accordingly, we conclude that the trial court did not commit clear error in concluding that Keystone, LLC, served a legitimate business purpose, and was not "a mere shell . . . used primarily as an intermediary to perpetrate fraud or promote injustice."[21] (Internal quotation marks omitted.) *Angelo*

---

[21] We disagree with the plaintiffs' reliance on the order denying the motion to dismiss in *Sellner* v. *Beechwood Construction Co.,* 175 Conn. 753, 386 A.2d 257 (1978), and argument that the "facts of the [present] case fit squarely within the four corners of th[at] case." Presuming that the plaintiffs meant instead to cite the published opinion on the merits of that appeal; *Sellner* v. *Beechwood Construction Co.,* 176 Conn. 432, 407 A.2d 1026 (1979); we note that, in that case, although the trial court had rendered judgment in that case in accordance with the jury's verdict piercing the corporate veil to render the defendant construction company's president personally liable on the contract, *none* of the issues on appeal pertained to the factual or legal correctness of that determination. Id., 433. The only analysis therein that related to the veil piercing issue was this court's rejection of the defendants' claim that the trial court had abused its discretion by permitting the plaintiffs to amend their complaint late in the trial to allege that the construction company was a " 'mere instrumentality' " for its president. Id., 437–38. Thus, we strongly disagree with the plaintiffs' claim that *Sellner* stands for the proposition that *this court* "held the president personally

*Tomasso, Inc.* v. *Armor Construction & Paving, Inc.*, supra, 557.

## IV

Finally, we address the plaintiffs' claim that the trial court improperly failed to award damages for unjust enrichment because the defendants had been enriched by the receipt of more than $650,000, without having provided the quality construction services for which the plaintiffs had contracted. This claim warrants little discussion, as we agree with the defendants that the trial court properly concluded that the damages for that cause of action were compensated by the judgment for the plaintiffs on the breach of contract and warranties act claims. See, e.g., *Stein* v. *Horton*, 99 Conn. App. 477, 485, 914 A.2d 606 (2007) ("[p]arties routinely plead alternative counts alleging breach of contract and unjust enrichment, although in doing so, they are entitled only to a single measure of damages arising out of these alternative claims").

The judgment is reversed in part and the case is remanded for a new trial limited to the issue of the damages awarded pursuant to counts one and eleven of the amended complaint. The judgment is affirmed in all other respects.

In this opinion the other justices concurred.

ZARELLA, J., concurring. I agree with and join the well reasoned opinion of the majority in this matter. I write only to express my concern that, since the passage of the Connecticut Unfair Trade Practices Act (CUTPA), General Statutes § 42-110a et seq., we increasingly have ignored the directive in the statute that "[i]t is the intent

liable on breach of contract and breach of warranty counts," and determined that the "corporate defendant was a mere instrumentality for its president." (Internal quotation marks omitted.)

of the legislature that in construing subsection (a) of this section, the commissioner [of consumer protection] and the courts of this state shall be guided by interpretations given by the Federal Trade Commission and the federal courts to Section 5 (a) (1) of the Federal Trade Commission Act (15 U.S.C. 45 (a) (1)), as from time to time amended." General Statutes § 42-110b (b). I point out that commentators, at least as early as 1988, have noted this court's lack of attention to major policy statements and decisions issued by the Federal Trade Commission (FTC). For example, Professor John Morgan noted in a 1988 article in the Connecticut Bar Journal that, "[a]s to unfair and deceptive acts and practices, FTC doctrine has been altered significantly in the [1980s]. Major policy statements have been issued and have later become binding precedent for the FTC by incorporation in FTC decisions. In spite of this adoption by the FTC, courts interpreting CUTPA have so far given only brief attention to the statements with no substantial discussion of their import. Courts continue to cite older authority where the current FTC policy is rather more elaborate or even where it differs markedly." J. Morgan, "The Connecticut Unfair Trade Practices Act: Determining the Standards of Conduct," 62 Conn. B.J. 74, 94 (1988). Other changes to FTC policy and decisions have occurred since this article was written but have received limited, if any, attention in our opinions. Nevertheless, it is also my view that the case presently before us would not be the appropriate case to take on such a review of our precedent, and, therefore, any such review must be left to a future case.