RENDERED: AUGUST 26, 2010
TO BE PUBLISHED

# Supreme Court of Kentucky

## 2009-SC-000007-DG

RACING INVESTMENT FUND 2000, LLC        APPELLANT


ON REVIEW FROM COURT OF APPEALS
V.        CASE NO. 2007-CA-002282-MR
FAYETTE CIRCUIT COURT NO. 02-CI-00769


CLAY WARD AGENCY, INC.        APPELLEE


**OPINION OF THE COURT BY JUSTICE ABRAMSON**

**REVERSING AND REMANDING**


Racing Investment Fund 2000, LLC is a limited liability company created in August 2000, to purchase, train and race thoroughbred horses. In May, 2004, Racing Investment entered into an agreed judgment with its former equine insurance firm, Clay Ward Agency, Inc., for past-due insurance premiums. Shortly thereafter, Racing Investment partially paid the judgment by tendering all of the remaining assets of the then-defunct limited liability company. When Racing Investment failed to pay the remainder of the amount owed, Clay Ward succeeded in having Racing Investment held in contempt of court for its failure to pay the entire judgment amount. Specifically, the trial court ruled that a provision in Racing Investment's Operating Agreement which allowed the limited liability company's Manager to call for additional capital

contributions, as needed, from all members on a pro rata basis for "operating, administrative or other business expenses" provided a means of satisfying the Clay Ward judgment. The trial court ordered that Racing Investment "act accordingly to satisfy the Judgment within a reasonable period of time" or face other sanctions. After the Court of Appeals affirmed, this Court granted discretionary review to consider whether the capital call provision can be invoked by a court to obtain funds from the limited liability company's members in order to satisfy a judgment against the limited liability company. Having concluded that KRS 275.150 provides for immunity from personal liability for a limited liability company's debts unless a member agrees otherwise and, further, that members of Racing Investment did not, by signing an operating agreement allowing for periodic capital calls from the Manager, subject themselves to personal liability, we reverse.

## RELEVANT FACTS

As noted, Racing Investment was formed as a limited liability company in August 2000 to engage in thoroughbred horse racing. The Operating Agreement provided for fifty units to be sold for an initial capital contribution of $100,000 per unit and allowed the Manager on an as-needed basis, subject to some limitations, to call for additional capital from the members in order to pay operating, administrative or other business expenses. The Manager of Racing Investment was Gaines-Gentry Thoroughbreds, LLC, which, as it name suggests, is a limited liability company in its own right.

Gaines-Gentry was the manager of a number of thoroughbred racing limited liability companies which, for several years, purchased equine insurance coverage through Clay Ward. Gaines-Gentry eventually brought suit against Clay Ward for breach of contract, fraud and negligence claims arising out of the alleged mishandling of the insurance of a foal and a stallion, neither of which was owned by Racing Investment. During the course of Gaines-Gentry's dispute with Clay Ward, Racing Investment did not pay certain insurance premiums it owed for coverage of its horses. In the course of the Gaines-Gentry litigation, Clay Ward eventually moved for summary judgment on its counterclaims against Racing Investment for the unpaid insurance premiums, a motion which Racing Investment did not oppose. After the matter of the prejudgment interest was resolved between the parties, Clay Ward and Racing Investment entered into an agreed judgment on May 27, 2004 for $69, 858.96, of which $12,719.28 was paid shortly thereafter.

As referenced *supra,* Clay Ward succeeded in its efforts to have Racing Investment held in contempt for failure to pay the outstanding balance of $57,139.68 as well as any post-judgment interest. The trial court and the Court of Appeals concluded that a provision in Racing Investment's Operating Agreement which allows the Manager to make additional capital calls provided a means for obtaining funds to satisfy the Clay Ward judgment, *i.e.,* a capital call should issue to each member of the LLC for his, her or its pro rata share of the balance owed on the judgment. The trial court also concluded that Racing Investment was in contempt of court for failing to have called for additional

3

capital from its members, a position which the Court of Appeals affirmed as properly within the trial court's discretion. Having granted discretionary review, we turn first to Kentucky Revised Statutes (KRS) Chapter 275 and general principles governing limited liability companies, and then the specific provisions of the Operating Agreement.

## ANALYSIS

In 1994, Kentucky joined a growing national trend by recognizing limited liability companies (LLCs) through the adoption of the "Kentucky Limited Liability Company Act" codified at KRS Chapter 275. As early commentators noted, the hallmark of this new form of business entity is its combination of the income tax advantages of a partnership with the business advantages of a corporation. Thomas Rutledge and Lady Booth, *The Limited Liability Company Act: Understanding Kentucky's New Organizational Option*, 83 Ky. L.J. 1 (1994-95). The "centerpiece" of a limited liability company is its "provision for limited liability of its members and managers in regard to the debts and obligations of the LLC . . . ." *Id.* at 6. *See also* Charles Fassler, *Kentucky Limited Liability Company* § 1.7 (2009) ("The most important feature of an LLC is its limited liability protection. . . . It is this limited liability that makes an LLC such a valuable entity.") One indicia of the strength of that limited liability protection is the Internal Revenue Service's recognition that federal employment tax

liabilities incurred by an LLC cannot be collected from the LLC's members. *Id.*

*citing* Rev. Rul. 2004-41, 2004-1 C.B. 845.[1]

Kentucky codified the limited liability feature of a limited liability

company at KRS 275.150 – "Immunity from personal liability":

> (1) Except as provided in subsection (2) of this section or as otherwise specifically set forth in other sections in this chapter, no member, manager, employee, or agent of a limited liability company, including a professional limited liability company, shall be personally liable by reason of being a member, manager, employee, or agent of the limited liability company, under a judgment, decree, or order of a court, agency, or tribunal of any type, or in any other manner, in this or any other state, or on any other basis, for a debt, obligation, or liability of the limited liability company, whether arising in contract, tort, or otherwise. The status of a person as a member, manager, employee, or agent of a limited liability company, including a professional limited liability company, shall not subject the person to personal liability for the acts or omissions, including any negligence, wrongful act, or actionable misconduct, of any other member, manager, agent, or employee of the limited liability company.
>
> (2) Notwithstanding the provisions of subsection (1) of this section, under a written operating agreement or under another written agreement, a member or manager may agree to be obligated personally for any of the debts, obligations, and liabilities of the limited liability company.

Notably, the statute contains a strong, detailed declaration of personal

immunity followed by recognition in subsection (2) that a member or members

---

[1] Kentucky has made exceptions, however, for state taxes owed by an LLC: there can be personal liability on the part of members for sales taxes, payroll taxes and other state taxes. *See* Fassler at § 1.8.

may agree in writing to be personally liable for the LLC's debts, obligations and liabilities. As one national commentator has noted, "[s]ince most LLCs are created for the purpose of obtaining limited liability, few LLCs take advantage of the opportunity to allow their members to waive limited liability under the act." Steven C. Alberty, *Limited Liability Companies: A Planning and Drafting Guide* § 3.06(b)(2) (2003).

Following the filing of articles of organization, KRS 275.020, the business of a limited liability company is typically conducted in accordance with an operating agreement, an agreement that has been analogized to a partnership agreement or even the articles of incorporation, by-laws and shareholders' agreement of a corporation. Fassler at § 1.5. KRS 275.015(20) defines an "operating agreement" in relevant part as "any agreement, written or oral, among all of the members, as to the conduct of the business and affairs of a limited liability company." If the members of a particular LLC do not adopt a written operating agreement or adopt one which is silent on certain matters, KRS Chapter 275 contains default provisions that will govern the conduct of the entity's business and affairs.

One of the matters inevitably addressed in an operating agreement is the capitalization of the LLC. Initial capital contributions are detailed as well as any obligation for future capital infusion because "[a]n LLC may need capital in addition to that contributed at the time it is organized." Alberty at § 4.02(b)(1). Consequently, the members' commitments, if any, to make future capital contributions are also "typically set forth in the LLC's operating agreement."

*Id. See also* Fassler at § 5.3.

In addition to the aforementioned principles of limited liability and capitalization, also relevant to the matter before us, given Racing Investment's cessation of business, is KRS 275.285 regarding dissolution of a limited liability company. That statute provides that an LLC shall be dissolved and its affairs wound up upon the happening of the first of a series of events. The one particularly relevant here is subsection (1) which provides in pertinent part for dissolution "upon the occurrence of events specified in the articles of organization or a written operating agreement." As for the effect of dissolution, KRS 275.300 (2) provides:

> A dissolved limited liability company shall continue its existence but shall not carry on any business except that appropriate to wind up and liquidate its business and affairs, including:
> (a)  Collecting its assets;
> (b)  Disposing of its properties that will not be distributed in kind to its members;
> (c)  Discharging or making provision for discharging its liabilities;
> (d)  Distributing its remaining property among its members according to their interests; and
> (e)  Doing every other act necessary to wind up and liquidate its business and affairs.

Thus, dissolved limited liability companies continue their existence throughout the process of winding up and liquidating the business.

Before turning to Racing Investment's Operating Agreement and the particular facts before us, we note that our standard of review as to interpretation of the provisions of both KRS Chapter 275 and the Operating Agreement is *de novo. Cumberland Valley Contrs., Inc. v. Bell County Coal*

7

*Corp.*, 238 S.W.3d 644, 647 (Ky. 2007) ("interpretation and legal effect of contract" and statutory construction are matters of law, subject to *de novo* review). Accordingly, the legal conclusions of the trial court and Court of Appeals, while carefully considered, are entitled to no deference. *Id.*

Racing Investment first contends that upon tendering the last of its assets to Clay Ward it dissolved pursuant to Section 11.1(a) of the Operating Agreement. More specifically, sub-subsection (ii) of that agreement provides for Racing Investment's dissolution "[u]pon the sale or other disposition of all, or substantially all, of the assets of the Company . . . ." Under KRS 275.285(1) quoted above, this occurrence, specifically identified in the Operating Agreement, clearly triggered dissolution of Racing Investment. However, as Clay Ward notes, KRS 275.300(2) provides that a dissolved LLC remains in existence to wind up and liquidate the business and that process includes specifically "discharging or making provision for discharging its liabilities." Racing Investment counters with the fact that the limited liability company had ceased business, wound up its affairs by distributing all of its assets and was thus terminated pursuant to the following language, again in Section 11.1 of the Operating Agreement:

> Dissolution of the Company shall be effective upon the date on which the event giving rise to the dissolution occurs, but the Company shall not terminate until the assets of the Company shall have been distributed as provided in Section 11.3 Notwithstanding dissolution of the Company, prior to the liquidation and termination of the Company, the business of the company and the affairs of the Members (*including, but*

8

> *not limited to,* the Investor Assignees), as such, shall
> continue to be governed by the Agreement.

(emphasis in original). While this termination argument appears to have some merit, it is difficult from the record before us to conclude definitively that indeed Racing Investment has terminated its existence. Racing Investment points to no evidence of record but relies on arguments of counsel regarding the status of Racing Investment as an entity whose existence has factually and legally terminated. With Racing Investment having failed to meet its burden of proof regarding the termination of the LLC, we turn to the larger question of the effect of the periodic capital call provision.

Section 4.3(a) of the Racing Investment Operating Agreement, entitled "Additional Capital Contributions" provides:

> The Investor Members (*including, but not limited to,* any Investor Assignees) shall be obligated to contribute to the capital of the Company, on a prorata basis in accordance with their respective Percentage Interests, such amounts as may be reasonably deemed advisable by the Manager from time to time in order to pay operating, administrative, or other business expenses of the Company which have been incurred, or which the Manager reasonably anticipates will be incurred, by the Company. *Except* under unusual circumstances, such additional capital contributions ("Additional Capital Contributions") shall not be required more often than quarterly and shall be due and payable by each Investor Member (*including, but not limited to,* each Investor Assignee) within fifteen (15) days after such Investor Member receives written notice from the Company of the amount due (a "Quarterly Bill"), The Manager shall not be required to make any additional capital contributions.

(emphasis in original). This is the provision relied upon by Clay Ward in contending that Racing Investment was in contempt of court for not having paid the agreed judgment in full. Under Clay Ward's interpretation, Racing Investment incurred a legitimate business expense for the equine insurance premiums prior to its dissolution and the members of the LLC, by agreeing to the periodic capital contribution provision, are subject to a "last call" to satisfy the outstanding balance on the judgment. In accepting this construction, the trial court and Court of Appeals essentially concluded that, by agreeing to make periodic capital contributions pursuant to Section 4.3(a), individual members of Racing Investment are legally responsible for their pro rata share of the entity's business debt. Indeed, under this theory, any outstanding debt that remains unpaid by the LLC can be satisfied through application for a court-ordered capital call. We reject this construction as contrary to the plain terms of the Operating Agreement and the letter and spirit of the Kentucky Limited Liability Company Act.

As discussed above, an operating agreement providing for future capital contributions by the LLC's members is neither "unique" as suggested by Clay Ward nor "atypical" as described by the Court of Appeals. Many businesses choosing the limited liability company form have circumstances that require periodic capital infusion. *See* Alberty at § 4.02(b) ("Often, an LLC will need financing in stages, and staggered contributions by members will be anticipated at the time the LLC is organized. . . . Both anticipated and unanticipated later capital contributions should be addressed in an LLC's

10

organizational documents.") Section 4.3(a) is a provision designed to assure members will contribute additional capital, as deemed necessary by the Manager, to advance Racing Investment's thoroughbred racing venture. While Clay Ward's insurance premiums were indeed a legitimate business expense for which the Manager could have made a capital call, that premise alone does not lead *a fortiori* to the relief ordered by the trial court. Simply put, Section 4.3(a) is a not-uncommon, on-going capital infusion provision, not a debt-collection mechanism by which a court can order a capital call and, by doing so, impose personal liability on the LLC's members for the entity's outstanding debt. Clay Ward insists that its quest to be paid is not about individual member liability, but there is no other way to construe what occurs when a court orders a capital call be made to pay for a particular LLC debt. From any viewpoint, the shield of limited liability has been lifted and the LLC's members have been held individually liable for its debt.

KRS 275.150 emphatically rejects personal liability for an LLC's debt unless the member or members, as the case may be, have agreed through the operating agreement or another written agreement to assume personal liability. Any such assumption of personal liability, which is contrary to the very business advantage reflected in the name "limited liability company", must be stated clearly in unequivocal language which leaves no room for doubt about the parties' intent. Section 4.3(a) of Racing Investment's Operating Agreement does not begin to meet this standard. A provision designed to provide on-going capital infusion as necessary, at the Manager's discretion, for the conduct of

the entity's business affairs is simply not an agreement "to be obligated personally for any of the debts, obligations and liabilities of the limited liability company." KRS 275.150(2). To reiterate, assumption of personal liability by a member of an LLC is so antithetical to the purpose of a limited liability company that any such assumption must be stated in unequivocal terms leaving no doubt that the member or members intended to forego a principal advantage of this form of business entity. On this score, Section 4.3(a) simply does not qualify.

As noted by both parties, the immediately following section of the Operating Agreement, Section 4.4, provides "[e]xcept as otherwise specifically provided in the [Kentucky Limited Liability Company] Act, no Member shall have any personal liability for the obligations of the Company." This provision underscores the fundamental premise of a limited liability company. However, this provision continues by stating that, "*except* . . . . as to Additional Capital Contributions . . . no Member shall be obligated to contribute additional funds or loan money to the Company." While Clay Ward views this exception as approval of its theory regarding a last capital call, the additional capital contributions under Section 4.3(a) are, again, those periodic capital contributions which the Manager concludes are necessary to meet Racing Investment's on-going expenses. Section 4.3(a) is not a post-judgment collection device by which any legitimate business debt of the LLC can be transferred to individual members by a court-ordered capital call. A judgment creditor of a limited liability company has available all legal means for

12

collection as against the entity itself but no means of securing relief from the LLC's individual members absent the unequivocal assumption of personal liability provided for in KRS 275.150(2).[2]

Having concluded that Section 4.3 of the Operating Agreement does not allow the unpaid portion of the agreed judgment against Racing Investment to be satisfied through a court-ordered capital call, we reverse the opinion of the Court of Appeals. We also remand this matter to Fayette Circuit Court for additional proceedings, if any, consistent with this opinion.

Minton, C.J.; Cunningham, Schroder, Scott, and Venters, JJ., concur. Noble, J., not sitting.

---

[2] KRS 275.200(5) does contain an exception for a creditor of a limited liability company "who extends credit or otherwise acts in reliance on the obligation [of a member to contribute to the LLC] after the member executes a writing which reflects that obligation and before the compromise [of the obligation by the unanimous consent of all members]. . . ." A creditor who has so relied may "enforce the original obligation." *Id.* This provision has no application to a future capital contribution provision, such as the one before the Court, which is not for an amount certain but rather provides discretion to the manager of the LLC to call for capital from members, on an as-needed basis, to meet expenses.

Nor is there before us any issue as to whether an LLC's limited liability veil may be pierced. *See, e.g., Naples v. Keystone Bldg. & Development Corp.,* 990 A.2d 326, 339-342 (Conn. 2010) (addressing piercing of LLC veil but declining to do so on facts presented).

COUNSEL FOR APPELLANT:

Joe Francis Childers, Jr.
Richard A. Getty
Jessica K. Case
Getty & Childers, PLLC
1900 Lexington Financial Center
250 West Main Street
Lexington, KY 40507


COUNSEL FOR APPELLEE:

James Burke Cooper
Boehl, Stopher & Graves
444 West Second Street
Lexington, KY 40507

David T. Royse
Stoll Keenon Ogden PLLC
300 West Vine Street, Suite 2100
Lexington, KY 40507-1801